852 F.2d 1421
 1989 A.M.C. 2144
 Jules SIMEON, Sr., and Ida Mae Griffin Simeon, Wife of Jules
Simeon, Sr., Plaintiffs-Appellees,
Cross-Appellants, Cross-Appellees,
v.
T. SMITH & SON, INC., Defendant-Appellee, Cross-Appellant,
v.
LUMAR MARINE, INC., Defendant-Appellant, Cross-Appellee.
 No. 86-3389.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 10, 1988.
 
 Henry S. Provosty, David L. Carrigee, Burke & Mayer, New Orleans, La., for Lumar Marine, Inc.
 William A. Porteous, III, Porteous, Hainkel, Johnson & Sarpy, New Orleans, La., for Simeon.
 Paul N. Vance, Andre J. Mouledoux, Harvey J. Godofsky, New Orleans, La., for T. Smith.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before KING, WILLIAMS, and GARWOOD, Circuit Judges.
 PER CURIAM:
 
 
 1
 Jules Simeon (Simeon), a deckhand on a derrick barge owned by T. Smith & Son, Inc. (Smith), was badly injured when his foot and leg were caught in a mooring line running from his barge to an adjacent hopper barge being prematurely towed away by a tug owned by Lumar Marine, Inc. (Lumar). Simeon sued his employer, Smith, alleging Jones Act negligence and unseaworthiness. He sued Lumar alleging general maritime negligence. His wife sued both defendants for her loss of consortium. The jury found that Simeon was ten percent contributorily negligent and that Smith was fifty-eight percent negligent, but its barge seaworthy. The general maritime law claim against Lumar was simultaneously tried to the court, which accepted the jury's advisory finding that Lumar was thirty-two percent negligent. The district court rendered judgment for Simeon against Smith and Lumar, severally, and for Mrs. Simeon against Lumar, based on the jury award, as remitted, in the Jones Act case, and otherwise on the district court's damages findings. Each party appeals, raising various objections. We affirm in part, reverse in part, and remand.
 
 Facts and Proceedings Below
 
 2
 Early on the morning of September 27, 1981, Simeon, then fifty-seven years old, reported to work on Smith's derrick barge, the PENNY, in the Mississippi River near Belle Chase, Louisiana. The PENNY was assigned to unload iron ore from an ocean-going vessel and place it on a hopper barge. The PENNY was positioned between the vessel and the hopper barge, which was held to the PENNY by mooring lines. On the PENNY was a large crane equipped with a bucket to scoop the ore off the ocean-going vessel and swing the load over to the hopper barge. The PENNY had a crew of five: Simeon and a fellow deckhand, the crane operator, a flagman positioned on the ocean-going vessel to help guide the crane operator, and a foreman responsible for the entire operation. It took all day to fill the hopper barge with ore. By the end of the shift, in late afternoon, the hopper barge was full and instructions were given to release the mooring lines so that a tug--the M/V TAKO BANDIT owned by Lumar--could tow the loaded hopper barge away.
 
 
 3
 Ordinarily it was not a complex matter to undo the mooring lines. The river current put tension on the mooring lines by pushing the hopper barge back as the lines were unwrapped from the bitts, but the tug waiting to pull the hopper barge away was supposed to gently push it against the current to compensate. When the lines were released, the deckhands signaled the tugboat pilot and he reversed directions and towed the hopper barge away.
 
 
 4
 On this day, the operation did not go so smoothly on the PENNY. Just as Simeon was almost finished unwrapping the bow mooring line, he slipped on some ore that had fallen onto the PENNY's deck; his right leg and foot were then caught in the mooring line at its end where a knot had been tied to stop the line from fraying. The hopper barge was drifting back, either with the current or because the tug, Lumar's M/V TAKO BANDIT, had begun towing it, and Simeon's foot, entangled in the moving mooring line, was nearly severed from his leg.
 
 
 5
 After a series of operations and two months' hospitalization, Simeon's foot was saved. Evidence at trial showed, however, that Simeon's condition was not normal after his operations. His foot hurt constantly, he had to walk with a cane, except around the house, and he could go only short distances before painful swelling occurred. He could not return to work and became gloomy and depressed. The quality of his marriage deteriorated and because Simeon's painful foot made him restless at night, his wife was forced to sleep in a separate bedroom.
 
 
 6
 The day before the third anniversary of his accident, Simeon and his wife filed suit against Smith and Lumar in the United States District Court for the Eastern District of Louisiana.[1] The two defendants filed cross-claims against each other for contribution. Simeon argued that the PENNY was unseaworthy and that his employer was negligent under the Jones Act because of the iron ore scattered on deck, the knotted mooring line, and the failure of the other deckhand to assist him in unwrapping the bow mooring line. Simeon asserted that Lumar was negligent under general maritime law for towing the hopper barge away before Simeon had released the mooring line.[2]
 
 
 7
 The Jones Act and unseaworthiness claims against Smith were tried to the jury[3]; the general maritime law negligence claim against Lumar was simultaneously tried to the court with the jury acting in an advisory capacity. The jury refused to find unseaworthiness, but found negligence on the part of Smith (fifty-eight percent), Lumar (thirty-two percent), and Simeon (ten percent). The jury awarded $1,250,000 for Simeon's past and future pain and suffering, $30,000 for his future medical expenses, and also awarded his wife $80,000 for her loss of consortium. The district court remitted the jury's pain and suffering award against Smith to $750,000, and Simeon accepted this remittitur. In its capacity as trier of fact of the maritime claim against Lumar, the district court rejected the jury's $1,250,000 pain and suffering award and chose instead the sum of $450,000. The district court accepted the jury's damage awards for future medical expenses and loss of consortium and also accepted the jury's apportionment of responsibility for the accident.
 
 
 8
 The district court then entered judgment for Simeon as follows: against Smith--$508,362.75 (fifty-eight percent of $876,487.50, which is the sum of $750,000 [pain and suffering], $30,000 [future medical], and $96,487.50 [stipulated lost wages still unpaid][4]; against Lumar[5]--$184,576 (thirty two percent of $576,487.50, which is the sum of $450,000 [pain and suffering], $30,000 [future medical], and $96,487.50 [stipulated lost wages still unpaid].[6] With regard to Simeon's damages, the court refused to enter a joint judgment against both Lumar and Smith; under the judgment rendered, each defendant is liable only for its respective proportion of total causation. The court additionally assessed Lumar alone with all of Mrs. Simeon's loss of consortium damages (less Simeon's ten percent contributory negligence) because the Jones Act, which was the only basis for Smith's liability, does not recognize a claim for loss of consortium. The court refused to order prejudgment interest on Simeon's Jones Act recovery against Smith because that claim was tried to the jury. The maritime claim against Lumar was bench tried, so the court ordered prejudgment interest on the entire recovery against Lumar beginning from the date of the accident.
 
 
 9
 The parties have raised nine issues on appeal: (1) whether the jury verdict against Smith was the product of passion and prejudice so as to require a new trial; (2) whether the pain and suffering damages against Smith should be further remitted below $750,000; (3) whether the district court's award of $450,000 for pain and suffering in Simeon's action against Lumar was adequate; (4) whether there is sufficient evidence to support the $30,000 award for future medical expenses; (5) whether the district court erred in holding Smith and Lumar severally, rather than jointly, liable; (6) whether Smith can be liable to Mrs. Simeon for loss of consortium based on negligence; (7) whether the district court erred in the consortium claim by not rendering judgment n.o.v. that the PENNY was unseaworthy; (8) whether the district court erred in ordering Lumar to pay the entirety of Mrs. Simeon's loss of consortium recovery (less Simeon's ten percent contributory negligence) even though Lumar was only thirty-two percent responsible for the accident; and (9) whether the district court's award of prejudgment interest against Lumar was in error.
 
 Discussion
 
 10
 I. Smith's "excessiveness" motion for new trial
 
 
 11
 In a post-trial motion, Smith requested a new trial on grounds that the jury verdict resulted from passion and prejudice. The district court held that the jury's award of $1,250,000 against Smith for Simeon's pain and suffering was excessive and ordered a new trial unless Simeon would accept a remittitur to $750,000. Simeon accepted the remittitur, but Smith continues to assert that a new trial was in order. We review the district court's denial of a motion for new trial for abuse of discretion. Complete Auto Transit, Inc. v. Floyd, 249 F.2d 396, 399 (5th Cir.1957), cert. denied, 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958).
 
 
 12
 Almost half a century ago, our Court stated, "[W]hile mere excessiveness in the amount to be awarded may be cured by a remittitur, that excessiveness which results from passion and prejudice, however natural the resentment which arouses it, may not be so cured." Brabham v. Mississippi, 96 F.2d 210, 214 (5th Cir.), cert. denied, 305 U.S. 636, 59 S.Ct. 103, 83 L.Ed. 409 (1938). A new trial must be ordered when the verdict results from passion and prejudice.
 
 
 13
 Smith argues that Simeon made several improper attempts to arouse passion and prejudice in the jury. His counsel asked Simeon to walk to a chalkboard to draw a diagram. (This was inflammatory, claims Smith, because counsel commented on Simeon's usual use of a cane, and the jury's attention was focused on Simeon's struggle to walk.) Simeon's counsel introduced "gruesome" pictures of his injury; in her testimony, Simeon's daughter commented that as a child she had bounced on her father's foot; Simeon's doctor described one particular treatment as a "crucifixion"; Simeon quite vividly described the injury and how it occurred, and also mentioned his annual salary and that his compensation had been cut off.
 
 
 14
 Smith's counsel lodged no contemporaneous objections to any of these occurrences except to Simeon's remark about his wages, and the district court instructed the jury to ignore Simeon's comment.
 
 
 15
 In those circumstances, we do not believe the cited instances required a new trial in lieu of a remittitur. The jury no doubt had observed Simeon's hobbled gait as he took the witness stand. Any additional impact on the jury as it watched Simeon walk to the chalkboard was not seriously prejudicial. The allegedly "gruesome" photographs simply show the condition of Simeon's foot as he recuperated in the hospital. Any "gruesomeness" was due wholly to the nature of Simeon's injury, and it is not shown that any other reasonably accurate and complete photographic portrayal would have been less gruesome. The testifying physician's reference to a particular procedure as a "crucifixion" was not without some legitimacy because that is apparently the shorthand medical term for that procedure, and it was not an inflammatory label concocted for trial. Simeon's description of the injury was vivid, but we do not believe he resorted to an excessively dramatic portrayal of how his foot was severed. The $1,250,000 award was excessive and, had Simeon not accepted the remittitur, a new trial would have been in order simply because the award was so "inordinately large as to be contrary to right reason." Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983) (quoting Floyd, 249 F.2d at 399). Nevertheless, the evidence on which Smith relies to prove that the verdict resulted from passion and prejudice is not strongly convincing, particularly in light of the failure to object in all instances save one where the objection was sustained. Hence, the district court did not abuse its discretion in refusing to order a new trial.
 
 II. Remittitur
 
 16
 The district court did not err in remitting Simeon's damages against Smith. In fact, the damages must be further remitted. It is well settled that a jury's damages award should not be disturbed unless it is "entirely disproportionate to the injury sustained." Caldarera, 705 F.2d at 784; see also Haley v. Pan American World Airways, Inc., 746 F.2d 311, 317 (5th Cir.1984). If the jury's award is unacceptably disproportionate, either the district or appellate court should reduce the award to "the maximum amount the jury could properly have awarded." Id. (citing Fifth Circuit precedent); see also Zeno v. Great Atlantic & Pacific Tea Co., 803 F.2d 178, 181 (5th Cir.1986). While pain and suffering is, to a large degree, not susceptible to monetary quantification, and the jury thus necessarily has especially broad leeway, nevertheless, " '[t]he sky is simply not the limit.' " Osburn v. Anchor Laboratories, Inc., 825 F.2d 908, 920 (5th Cir.1987) (quoting Caldarera, 705 F.2d at 784).
 
 
 17
 Drawing a measure of general guidance from, though not being rigidly circumscribed by, cases involving somewhat comparable injuries,[7] it is clear to us that the jury's pain and suffering award of $1,250,000 was in excess of the maximum reasonable recovery. The district court, which heard the same evidence as the jury, assessed pain and suffering damages at $450,000, and even this is a more generous award than many given in recent years for similar injuries. We hold that $600,000 is the maximum reasonable damages figure for Simeon's pain and suffering in his action against Smith. If Simeon will not accept a remittitur on this basis, a new trial must be held.
 
 
 18
 We further hold that the district court's award of $450,000 for pain and suffering in Simeon's action against Lumar was not clearly erroneous or inadequate.
 
 III. Future medical expenses
 
 19
 The jury also awarded $30,000 for Simeon's future medical expenses. There is no evidence in the record to support an award of this size, and so it necessarily is based on impermissible conjecture. See Haley v. Pan American World Airways, Inc., 746 F.2d 311, 316 (5th Cir.1984). The only record evidence regarding Simeon's future medical expenses was testimony from his physician, who said there was a fifty-fifty chance that Simeon would need another operation, the total cost of which would be about $10,000.[8] Accordingly, we order a remittitur reducing Simeon's award for future medical expenses to $10,000, and if this is not accepted, a new trial will be required. Based on the record evidence, this amount represents the maximum reasonable recovery for future medical expenses.
 
 
 20
 IV. Joint or several liability?
 
 
 21
 As to Simeon's damages, the district court entered judgment against Smith and Lumar severally. (Part VI, infra, of our opinion discusses the apportionment of Mrs. Simeon's recovery for loss of consortium.) We agree with the contention raised by Simeon in his cross-appeal that judgment should have been entered against the defendants jointly.
 
 A. Admiralty
 
 22
 Like the common law, W. Prosser & P. Keeton, Prosser & Keeton on the Law of Torts Sec. 47 at 328 (1984), the general maritime law has long recognized the concept of joint liability. For example, in The Atlas, 93 U.S. 302, 23 L.Ed. 863 (1876), the Supreme Court held that the insurer of cargo lost in a collision between two vessels caused by the fault of both could recover all of its damages from one vessel. The Court borrowed this rule from the common law, which recognized a plaintiff's right "to sue ... all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss." Id., at 315, 23 L.Ed. at 866; see also The Alabama, 92 U.S. 695, 23 L.Ed. 763 (1876); The George Washington, 76 U.S. 513, 19 L.Ed. 787 (1870); The Juniata, 93 U.S. 337, 23 L.Ed. 930 (1876); The Sterling, 106 U.S. 647, 1 S.Ct. 89, 90, 27 L.Ed. 98 (1882) (describing the joint liability rule in admiralty as "well-established"). Neither the Supreme Court nor the lower courts have ever retreated from the rule of joint liability under maritime law. See, e.g., Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2756 n. 7, 61 L.Ed.2d 521 (1979); Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974); Seal Offshore, Inc. v. American Standard, Inc., 777 F.2d 1042 (5th Cir.1985); Todd Shipyards Corp. v. Auto Transportation, S.A., 763 F.2d 745, 756 (5th Cir.1985); Central Rivers Towing, Inc. v. City of Beardstown, Ill., 750 F.2d 565, 575 (7th Cir.1984).
 
 
 23
 Collision cases provided the context in which joint liability was applied most frequently,[9] but the rule of joint liability also has been applied in cases, like Simeon's, involving other maritime fault-based claims. See, e.g., Cooper Stevedoring, 94 S.Ct. at 2178 (commenting that plaintiff longshoreman who slipped while loading vessel "could have proceeded against either The Vessel or [the nonemployer stevedore company, which had created the dangerous condition in loading at a prior port] or both of them to recover full damages for his injury"); Joia v. Jo-Ja Service Corp., 817 F.2d 908 (1st Cir.1987).[10]
 
 
 24
 Defendants note that at common law any negligence on the part of the plaintiff barred his recovery, e.g., W. Prosser & P. Keeton, supra, Sec. 65 at 461, and assert that joint liability was designed to soften the impact of the harsh rule of contributory negligence. Defendants reason, therefore, that because the trend developing over the past twenty-five years or so has been for states to replace the common-law rule of contributory negligence with some version of comparative fault, id. Sec. 67 at 471, the concept of joint liability should likewise be retired. Whatever the logic of this argument, it overlooks the fact that "[m]ost jurisdictions which have adopted comparative negligence have retained the common law rule of joint and several liability...." Id. at 475; see F. Harper, F. James, O. Gray, 3 The Law of Torts Sec. 10.1, at 31 (2d ed. 1986). More importantly, defendants ignore the fact that maritime law, which historically has adhered to the rule of joint liability, early on rejected the common law's rule of contributory negligence. See generally M. Norris, 2 The Law of Seamen Sec. 30:32 (1985); The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890).
 
 
 25
 In The Max Morris, the Supreme Court noted that contributory negligence as a bar to recovery in ship collision cases was rejected in The Catharine v. Dickinson, 17 How. 170, 15 L.Ed. 233 (1855), which adopted the well established English rule of divided damages. However, noted the Court, the lower federal courts were in disagreement over whether to apply the common law's rule of contributory negligence outside the collision context. 11 S.Ct. at 32. The Max Morris, which was not a collision case, resolved this conflict. That case was an admiralty suit brought by a longshoreman who fell from a vessel's bridge to the deck while loading coal. Although the longshoreman was contributorily negligent, the Supreme Court held that "[c]ontributory negligence in a case like the present should not wholly bar recovery," id. at 33, but would merely reduce it. Id. The Supreme Court has never wavered from The Max Morris. Justice Black's comment more than thirty years ago in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953), remains an accurate description of this aspect of admiralty law: "The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice." See also Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2755 n. 2, 61 L.Ed.2d 521 (1979); Lewis v. Timco, Inc., 716 F.2d 1425, 1427 (5th Cir.1983) (en banc).
 
 
 26
 In multiple defendant cases where plaintiff also is negligent, it has never been suggested that joint liability is inapplicable. In Gele v. Chevron Oil Co., 574 F.2d 243 (5th Cir.1978), the accident occurred when a pleasure fishing boat collided with an oil company flare pipe in the Gulf of Mexico. The plaintiff was a passenger on the fishing boat. The district court found that the oil company was wholly responsible; we held this finding clearly erroneous on grounds that those operating the fishing boat were partly to blame because the boat had been traveling at an "imprudent" speed. Id. at 249. We remanded the case for a determination of whether plaintiff was partly responsible for operating the fishing boat. Speaking for the Court, Judge Brown observed in Gele that (1) any negligence by plaintiff would not bar his recovery, but merely reduce it, id. at 250, and (2) that plaintiff had a "right to collect all his damages from one party in the event he is unable to obtain a relative portion of damages from each party at fault." Id. at 251; see also Empire Seafoods, Inc. v. Anderson, 398 F.2d 204 (5th Cir.), cert. denied, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968) (holding that the joint liability rule applies even when plaintiff is contributorily negligent); Drake Towing Co. v. Meisner Marine Construction Co., 765 F.2d 1060, 1067 (11th Cir.1985) (holding that plaintiff could recover all damages except those representing his share of negligence from one of two joint tort-feasors); Joia v. Jo-Ja Service Corp., 817 F.2d 908 (1st Cir.1987) (same).[11]
 
 
 27
 In sum, our investigation shows that under maritime law concurrent tort-feasors are jointly liable, even when plaintiff is contributorily negligent. However, only Lumar was a maritime defendant. Smith's liability arises solely under the Jones Act; hence, we must determine whether a rule of joint liability is consistent with that statute.
 
 B. The Jones Act
 
 28
 The Jones Act, 46 U.S.C.App. Sec. 688, incorporates the Federal Employers' Liability Act (FELA), 45 U.S.C. Sec. 51 et seq. E.g., Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 766, 15 L.Ed.2d 740 (1966). The FELA, in turn, creates federal rights "largely fashioned from the common law ... except as Congress has written into the Act different standards." Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943); see also Hall v. Minnesota Transfer Ry. Co., 322 F.Supp. 92, 94 (D.Minn.1971). Therefore, we must construe the FELA, and hence the Jones Act, consistent with the common law, except where the statute explicitly departs from the common law or has been judicially construed to do so.
 
 
 29
 There are, of course, important departures in the FELA from the common law. For example, the FELA abolishes the common law's fellow servant rule, Sinkler v. Missouri Pacific R.R., 356 U.S. 326, 78 S.Ct. 758, 762, 2 L.Ed.2d 799 (1958), eliminates the absolute defenses of contributory negligence, 45 U.S.C. Sec. 51, and assumption of risk, 45 U.S.C. Sec. 54, and incorporates a featherweight standard of causation, e.g., Webb v. Illinois Central R.R., 352 U.S. 512, 77 S.Ct. 451, 454, 1 L.Ed.2d 503 (1957). However, joint liability was the rule at common law, and we have not found any case holding that the FELA or the Jones Act has changed this.
 
 
 30
 As noted, contributory negligence is not a complete bar to recovery under the FELA (and the Jones Act), but merely reduces plaintiff's recovery.
 
 
 31
 C. Joint liability of Jones Act defendant with general maritime defendant
 
 
 32
 Defendants argue that even if joint liability is proper as to maritime defendants or Jones Act defendants, it is not proper to cause a Jones Act defendant to be jointly liable with a maritime defendant. For this proposition defendants cite Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), a case in which the Supreme Court held that negligent defendants were not jointly liable with a tort-feasor whose liability arose from unseaworthiness because unseaworthiness "rests upon an entirely different basis" from negligence. Id., 66 S.Ct. at 875. The basis of Smith's liability is the Jones Act, while Lumar's liability arises under the general maritime law. But despite the fact that the respective obligations of Lumar and Smith toward Simeon arise from different sources, the obligation is the same: to avoid fault by acting reasonably. Sieracki is distinguishable from this case on grounds that unseaworthiness is not based on fault. 66 S.Ct. at 877; Cooper Stevedoring, 94 S.Ct. at 2179 (commenting that unseaworthiness defendant not jointly liable with negligent defendant because unseaworthiness does not require a showing of fault); see Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971); cf. Restatement (Second) of Torts Sec. 876 caveat (1979) (ALI takes no position on whether one acting in concert with another should be liable for acts of the other when the liability of either is based on strict liability). By contrast, both the Jones Act and maritime negligence are fault-based, and so we believe the Sieracki "rule" is inapplicable.
 
 
 33
 Defendants argue that because the Jones Act burden of causation is lighter than that applied to a maritime law negligence claim, e.g., Chisholm v. Sabine Towing & Transportation Co., 679 F.2d 60, 62 (5th Cir.1982) (citing cases), the Sieracki "rule" should apply to prevent the judgment in this case from being joint. Defendants do not cite any case suggesting that the different burden of causation applied to these two bases of recovery is sufficient to take the case out of the rule of joint liability. On the contrary, there is precedent for holding a Jones Act defendant jointly liable with a defendant whose negligence arises under state or general maritime law. See Joia v. Jo-Ja Service Corp., 817 F.2d 908, 915-18 (1st Cir.1987); Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716 (11th Cir.1982), cert. denied, 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983).
 
 D. Joint liability
 
 34
 Accordingly, we sustain Simeon's claim on his cross-appeal that the district court erred by making the judgment in his favor against Smith and Lumar several only, with the liability of each such defendant limited to the percentage of Simeon's damages corresponding to the percentage of fault of that particular defendant (fifty-eight percent for Smith; thirty-two percent for Lumar). Smith and Lumar, therefore, are jointly and severally liable for ninety percent (one hundred percent, less Simeon's ten percent contributory negligence) of Simeon's damages.
 
 
 35
 Application of the rule of joint liability is somewhat complicated in the present case by reason of there being different pain and suffering awards in the actions against the different defendants, $600,000 (assuming that Simeon accepts the remittitur we order) in Simeon's jury-tried Jones Act case against Smith, and $450,000 in Simeon's bench-tried general maritime law case against Lumar. Simeon's total damages in his action against Smith are thus $706,487.50 ($600,000 pain and suffering, plus $10,000 future medical, plus $96,487.50 stipulated lost wages still unpaid, see note 2, supra, assuming Simeon accepts our remittiturs on the first two items); and his total damages in his action against Lumar are $556,487.50 ($450,000 pain and suffering, plus $10,000 future medical, plus $96,487.50 stipulated lost wages still unpaid, again assuming Simeon accepts our remittitur on the future medical). On these figures, Simeon will have judgment against Smith and Lumar, jointly and severally, for $500,838.75 (which is ninety percent--one hundred percent, less Simeon's ten percent negligence--of the $556,487.50 which represents Simeon's total damages that are common to his actions against both Smith and Lumar), and Simeon will additionally have judgment against Smith alone for the further sum of $135,000 (ninety percent of the $150,000 which represents the excess of Simeon's total damages in his action against Smith over his total damages in his action against Lumar).[12]
 
 V. Unseaworthiness
 
 36
 Mrs. Simeon asserts that there is insufficient evidence to support the verdict that Smith's barge, the PENNY, was seaworthy.[13] Neither of the Simeons asked the court for a directed verdict on unseaworthiness--either after resting their cases or after defendants rested. (Nor, for that matter, did either seek a judgment n.o.v. or new trial on this basis after the jury found the PENNY seaworthy.)
 
 
 37
 "It is well-settled in this Circuit that in the absence of a motion for a directed verdict at the close of all the evidence, the sufficiency of the evidence to support a jury verdict is not reviewable on appeal. Coughlin v. Capitol Cement Co., 571 F.2d 290, 297 (5th Cir.1978). Appellate inquiry is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a 'manifest miscarriage of justice.' Id." Shipman v. Central Gulf Lines, Inc., 709 F.2d 383, 385 (5th Cir.1983).
 
 
 38
 Certainly by this standard of review, there is sufficient evidence to support the jury's finding that the PENNY was seaworthy.
 
 
 39
 Although the shipowner has an absolute duty to provide a seaworthy vessel, e.g., Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960); Brunner v. Maritime Overseas Corp., 779 F.2d 296, 298 (5th Cir.), cert. denied, 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986), the vessel need not be "accident-free." Mitchell, 80 S.Ct. at 933. "The duty is absolute, but it is a duty only to furnish a vessel and appurtenancesreasonably fit for their intended use. The standard is not perfection, but reasonable fitness...." Id. (emphasis added); see Stevens v. East-West Towing Co., 649 F.2d 1104, 1107-08 (5th Cir.1981), cert. denied, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982). The jury charge paraphrased this passage from Mitchell. The Simeons argue that the iron ore scattered on deck, the knot in the mooring line, and the failure of the other deckhand to assist Simeon rendered the PENNY unseaworthy. A reasonable jury could weigh this evidence and still conclude that the PENNY was "reasonably fit" for its intended use as a derrick barge.
 
 
 40
 The Simeons contend, however, that the jury's verdict of Jones Act negligence against Smith necessarily includes a finding of unseaworthiness. We cannot agree. Both the Supreme Court, e.g., Mitchell, 80 S.Ct. at 932; Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971), and our Court, e.g., Thezan v. Maritime Overseas Corp., 708 F.2d 175, 180 (5th Cir.1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984); Alverez v. J. Ray McDermott & Co., 674 F.2d 1037, 1041 (5th Cir.1982), have emphasized that the Jones Act and unseaworthiness are distinct theories of recovery. The settled rule in the Fifth Circuit is that there is no fundamental, necessary inconsistency between the two verdicts of negligence and seaworthiness.
 
 
 41
 Our holding in Brunner, 779 F.2d at 298-99, is instructive. The plaintiff had slipped in some oil on the deck of his vessel. This single defect was the basis for both his Jones Act and unseaworthiness claims. As here, the jury held the employer negligent, but the vessel seaworthy. We held that these were not inconsistent verdicts:
 
 
 42
 "Although these answers may not achieve legal nicety, they are not irreconcilable. We do not have the right to second guess a jury that may decide a small oil spill on a deck does not necessarily make an 80,000 ton tanker unseaworthy even if the spill got there negligently." Id. at 299.
 
 
 43
 See also Kokesh v. American Steamship Co., 747 F.2d 1092, 1094 (6th Cir.1984) (same); cf. Thezan, 708 F.2d at 180 (same, but plaintiff had also made negligence claims unrelated to seaworthiness); Alverez, 674 F.2d at 1041 (same as Thezan ); Gosnell v. Sea-Land Service, Inc., 782 F.2d 464, 467 (4th Cir.1986) (verdicts not inconsistent because of much lighter causation burden under Jones Act). But see Lee v. Pacific Far East Line, Inc., 566 F.2d 65, 67 (9th Cir.1977). In sum, there is no plain error in the finding of seaworthiness. In light of Brunner and related cases, we do not believe the jury's finding of seaworthiness is fatally undermined by its verdict of Jones Act negligence.
 
 
 44
 VI. Apportionment of loss of consortium damages
 
 
 45
 (a) The jury and the district court found Mrs. Simeon's loss of consortium damages to be $80,000. Smith is partly responsible for causing these damages as a matter of fact. However, as stated in part V, supra, Smith has been acquitted of unseaworthiness under general maritime law. Accordingly, Smith's only basis for liability in this case is negligence, and, as Smith is seaman Simeon's employer, it has no negligence liability to him under the general maritime law but only under the Jones Act, and a Jones Act employer is not liable for loss of consortium damages to the spouse of the employee seaman. E.g., Beltia v. Sidney Torres Marine Transport, Inc., 701 F.2d 491, 492-93 (5th Cir.1983); Cruz v. Hendy International Co., 638 F.2d 719, 723 (5th Cir.1981).
 
 
 46
 (b) As a general maritime law defendant which is not the injured seaman's employer, Lumar is liable for loss of consortium damages based on its negligence, see American Export Lines, Inc. v. Alvez, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980); Tullos v. Resource Drilling, Inc., 750 F.2d 380, 385-86 (5th Cir.1985), and the district court ordered Lumar to pay Mrs. Simeon $72,000, an amount representing all her loss of consortium damages, less a ten percent deduction for Simeon's contributory negligence.[14] Based on our holdings in part IV, supra, we reject Lumar's claim that it should not be liable for as much as ninety percent of Mrs. Simeon's loss of consortium damages, since it was only thirty-two percent at fault. For the same reasons, we decline to follow the dissent's theory that Lumar should only be liable for 32/42nds of Mrs. Simeon's loss of consortium damages.
 
 
 47
 (c) We also hold that Lumar is not entitled to contribution from Smith in respect to Lumar's loss of consortium liability to Mrs. Simeon. The traditional view is that there can be no contribution between concurrent tort-feasors unless they share a "common legal liability" toward the plaintiff. F. Harper, F. James, O. Gray, 3 The Law of Torts Sec. 10.2 at 46 (2d ed. 1986); W. Prosser & P. Keeton, supra, Sec. 50 at 339-40. The contribution action arises from the original obligation that the party cast in contribution owed to the plaintiff. "If there was never any such liability, as where the contribution defendant has the defense of family immunity, assumption of risk, or the application of an automobile guest statute, or the substitution of workers' compensation for common law liability, then there is no liability for contribution." W. Prosser & P. Keeton, supra, Sec. 50 at 339-40. E.g., Restatement (Second) of Torts Sec. 886A, comment g (1979); Green v. United States Dept. of Labor, 775 F.2d 964, 971 (8th Cir.1985); Fischbach & Moore International Corp. v. Crane Barge R-14, 632 F.2d 1123, 1125 (4th Cir.1980); Jones v. Schramm, 436 F.2d 899, 901 (D.C.Cir.1970); Yellow Cab Co. v. Dreslin, 181 F.2d 626 (D.C.Cir.1950); see Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2765 n. 2, 61 L.Ed.2d 521 (1979) (Blackmun, J., dissenting).[15]
 
 
 48
 In this case, we follow the traditional view. To allow Lumar an action in contribution against Smith would be inconsistent with our cases holding that the Jones Act employer is not responsible for loss of consortium damages. See Beltia, supra; Cruz, supra. Somewhat analogous is Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), which held that the shipowner cast in liability for all damages had no right of contribution from the plaintiff longshoreman's employer, who was also allegedly at fault. See also Atlantic Coast Line R. Co. v. Erie Lackawanna R. Co., 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972) (same); Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 2177-79, 40 L.Ed.2d 694 (1974) (explaining that Halcyon and Atlantic Coast prohibited contribution because the employers in those cases were protected from a direct claim by the LHWCA). See also Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2757, 61 L.Ed.2d 521 (1979) (same).
 
 
 49
 Sometimes a "concurrent" tort-feasor who is immune from the plaintiff's direct action and thus immune from a traditional contribution claim, owes the other concurrent tort-feasor some independent duty, or has made some express or implied promise to that tort-feasor so that a "contribution" action is permissible. This type of "contribution" does not arise because of an obligation running from the contributing tort-feasor to the plaintiff; it rather arises because of the relationship directly between the concurrent tort-feasors themselves. See Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (permitting indemnity claim by shipowner against LHWCA employer on grounds that employer had breached its contractual obligation running to shipowner); Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983) (holding that the exclusive liability protection afforded the United States by Federal Employees' Compensation Act, 5 U.S.C. Sec. 8101 et seq., would not bar an indemnity claim by a concurrent tort-feasor, provided there was some substantive law of indemnity on which the claim could be based); Travelers Insurance Co. v. United States, 493 F.2d 881, 886 (3d Cir.1974) (discussing Weyerhaeuser ). In this case, no party has sought to prove the existence of any such obligation running directly from Smith to Lumar. Therefore, we apply the traditional view of no contribution as exemplified by cases such as Halcyon, and deny Lumar contribution from Smith respecting Mrs. Simeon's loss of consortium.
 
 VII. Prejudgment interest
 
 50
 We must modify the district court's award of prejudgment interest. The court refused to order prejudgment interest on the Jones Act damages awarded by the jury against Smith. This ruling is correct because Smith's liability arises under the Jones Act and "prejudgment interest is not recoverable in Jones Act cases tried to a jury." See McPhillamy v. Brown & Root, Inc., 810 F.2d 529, 532 n. 1 (5th Cir.1987) (citing Fifth Circuit precedent). Lumar's liability to Simeon and his wife arises under general maritime law after a bench trial. The district court exercised its discretion and ordered prejudgment interest on those maritime damages. This was proper because "[t]he award of prejudgment interest under maritime law is 'well-nigh automatic.' " Id. (quoting Reeled Tubing, Inc. v. M/V CHAD G, 794 F.2d 1026, 1028 (5th Cir.1986)). However, the district court should not have ordered prejudgment interest on all the damages recoverable from Lumar because some of them were to compensate for future (i.e., posttrial) harm. Martin v. Walk, Haydel & Associates, 794 F.2d 209, 212 (5th Cir.1986); Williams v. Reading & Bates Drilling Co., 750 F.2d 487, 491 (5th Cir.1985). As in Martin, we remand this case so that the district court may apportion damages (both economic and other) between past and future harm and award prejudgment interest only on those damages that the plaintiff in question had incurred as of the initial judgment date.[16]
 
 
 51
 Lumar must pay prejudgment interest on so much of the $500,838.75 damages for which it is liable to Simeon in Simeon's case against it as represents damages incurred prior to trial, and on so much of Mrs. Simeon's $72,000 loss of consortium damages for which it is liable as represents damages incurred by her prior to trial, but Lumar may not recover in a contribution action against Smith any amount representing prejudgment interest paid to the Simeons. Smith is not directly obligated to pay Simeon prejudgment interest and, as noted in part VI, supra, there has been no suggestion of any independent obligation running from Smith to Lumar requiring it to indemnify or share in damages for which Smith could not have been directly responsible.
 
 Conclusion
 
 52
 In sum, we: (1) reject Smith's claim that it is entitled to a new trial; (2) order a further remittitur to $600,000 of Simeon's pain and suffering damages in his action against Smith; (3) order a remittitur to $10,000 of Simeon's future medical expense damages in his actions against Smith and Lumar[17]; (4) reject Simeon's attack on the district court's fixing of his pain and suffering damages at $450,000 in his action against Lumar; (5) affirm the district court's unattacked award of contribution to Smith and against Lumar respecting Smith's pretrial payments to Simeon; (6) sustain, as stated in part IV, supra, hereof, Simeon's contention that the district court erred in making the judgment against Smith and Lumar entirely several, and direct that, if Simeon accepts our remittiturs, Simeon have judgment against Smith and Lumar jointly and severally for the principal sum of $500,838.75 and also against Smith alone for the further principal sum of $135,000 (all such sums to bear appropriate postjudgment interest from the initial judgment); (7) hold that Smith and Lumar are entitled to contribution from one another in respect to Simeon's actions against them as stated in note 12, supra; (8) reject the attacks of the Simeons on the finding of the jury in Smith's favor on unseaworthiness; (9) reject Mrs. Simeon's claim that the district court erred by denying her loss of consortium recovery from Smith based on Smith's negligence; (10) sustain Mrs. Simeon's $72,000 loss of consortium judgment against Lumar (except for remand in respect to prejudgment interest as per (13) below); (11) hold that Lumar is not entitled to contribution from Smith in respect to any loss of consortium by Mrs. Simeon or any prejudgment interest due by Lumar to either of the Simeons; (12) sustain the district court's denial of prejudgment interest in Simeon's suit against Smith; and (13) hold that Simeon and Mrs. Simeon are entitled to appropriate prejudgment interest from Lumar on, but only on, so much of their damages recoverable from Lumar as were incurred and had accrued prior to trial, but not on the portion thereof which would accrue or be incurred after trial, and remand to the district court to divide such damages accordingly and determine the appropriate prejudgment interest, all as stated in part VII, supra, of our opinion.
 
 
 53
 Accordingly, the judgment below is AFFIRMED in part and REVERSED in part, and the cause is REMANDED for further proceedings consistent herewith.
 
 
 54
 GARWOOD, Circuit Judge, concurring in part and dissenting in part:
 
 
 55
 I concur in all of the majority opinion except its part IVD and except so much of its part VI(b) as holds Lumar liable for ninety percent, instead of 32/42nds, of Mrs. Simeon's loss of consortium damages.
 
 
 56
 As to the majority's part IVD, while I agree that the liability of Smith and Lumar should not be entirely several (so that Smith is liable only for fifty-eight percent of Simeon's damages, and Lumar only for thirty-two percent), I am nevertheless of the opinion that traditional joint and several liability is inappropriate in light of Simeon's contributory negligence, and that the most just solution is a form of what may be called, perhaps somewhat misleadingly, "modified joint liability." Under such a regime, where the plaintiff is contributorily negligent, the fraction of the plaintiff's total damages for which a defendant, who is one of two or more tortfeasors, may be liable to the plaintiff is the same fraction that that defendant's negligence is of the total negligence of the plaintiff and that particular defendant. In other words, for this purpose only the negligence of the plaintiff and the particular defendant in question are compared.
 
 
 57
 To avoid double recovery and allow for appropriate contribution, the form of judgment in a case such as this involving a negligent plaintiff and two or more negligent defendants will need to provide for some several liability as well as for some joint and several liability. For example, consider the case of a three-car accident, with each driver, A, B, and C, equally at fault, plaintiff, A, suffering $150,000 total damages, defendants B and C suffering no damages, no party being vicariously liable for the fault of another, and there being no other tort-feasor. In such an instance, modified joint liability would call for A to be awarded a total judgment of $100,000, composed of the following: a $25,000 award in favor of A against B alone; a $25,000 award in favor of A against C alone; and a $50,000 award in favor of A against B and C jointly and severally. To the extent that B were to pay A more than $50,000 under the entire judgment, B would have judgment over for contribution against C; to the extent that C were to pay A more than $50,000 under the entire judgment, C would have judgment over for contribution against B. The precise application of these principles to Simeon's suit against Lumar and Smith will be discussed in more detail below.
 
 
 58
 As to the majority's part VI(b), similar considerations dictate that Mrs. Simeon should not recover ninety percent of her loss of consortium damages from Lumar, but only that fraction--32/42nds--which Lumar's negligence is of the combined negligence of Simeon (properly imputed to Mrs. Simeon) and Lumar. The fact that Mrs. Simeon's negligence claim against Smith ought to have been dismissed on the pleadings (as the majority correctly holds) merely highlights the fact that Smith's negligence should be irrelevant to Lumar's appropriate share of Mrs. Simeon's damages. That should be based simply on a comparison of Lumar's negligence with that properly imputed to Mrs. Simeon.
 
 
 59
 A brief overview of some well known tort concepts and their more recent evolution will help place the theory of this partial dissent in context.[1]
 
 
 60
 At common law, a fault-free plaintiff could recover all his damages from any one of several concurrent tort-feasors. This was the doctrine of joint and several liability. It was not based on the concept that one of the concurrent tort-feasors should be held liable for the wrong of another. Rather, joint and several liability was premised on the very different concept that each tort-feasor was responsible for all of which his own wrong was a cause. The fault or liability of others--except the plaintiff--was irrelevant. The same reasoning--that a wrongdoer is responsible for all that of which his wrong is a cause--dictated the rule that the plaintiff's contributory negligence, no matter how slight in comparison to the defendant's negligence, barred all recovery. This was not because the plaintiff's negligence made him responsible for the defendant's wrong, but because the plaintiff's negligence was a cause of all his damages, and he was responsible for all that of which his wrong was a cause. The harshness of this latter result led to the adoption of comparative fault in instances where the plaintiff was contributorily negligent. Under this concept, the complete bar of contributory negligence is lifted, neither party is responsible for all the results of his wrong, each being mutually relieved of a portion thereof, and the loss is apportioned according to the comparative fault of the parties. Where only the plaintiff and one other are at fault, the fault of the injured plaintiff is compared to that of the defendant, and the latter bears that fraction of the loss which his fault is of the total fault of himself and the plaintiff. If the plaintiff and the defendant are equally at fault, the defendant bears half the plaintiff's loss; if the defendant is twice as much at fault as the plaintiff, he bears two-thirds of the plaintiff's loss. If there are additional parties at fault, generally no problem is presented where all are solvent and before the court as defendants. Otherwise, however, the situation may be more difficult, particularly where one of the defendants is insolvent. In such an instance, the basis on which the fault of the plaintiff and that of the defendant or defendants is compared becomes crucial.
 
 
 61
 Because of the relatively recent adoption of comparative negligence, there are few reported appellate decisions in this area. Generally speaking, only two approaches have been considered. The most widespread approach among the states has been to hold that the solvent defendant is in effect charged with the negligence of the insolvent defendant for purposes of the comparison to be made to the plaintiff's negligence. Referring back to the illustration of the three-car accident, in which each party is equally at fault, this means that if defendant C is insolvent then solvent defendant B must bear two-thirds of plaintiff A's damages, although A and B are equally at fault. See W. Prosser & P. Keeton, Prosser & Keeton on the Law of Torts Sec. 67 at 475 (1984); F. Harper, F. James, O. Gray, 4 The Law of Torts Sec. 22.17 at 413-16 (1986); 57 Am.Jur.2d Negligence Sec. 435 at 860 (1971). This appears to me to be an essentially reflexive invocation of common-law joint liability. However, it ignores the fact that common-law joint liability considered the fault of others (except the plaintiff) irrelevant, and did not rest on charging one defendant's fault to another. It also ignores the fact that comparative fault modified, as between a negligent plaintiff and a negligent defendant, the principle that each party is responsible for all the results of his wrong. Little is said to actually justify comparing the plaintiff's fault to that of all the defendants in determining the extent of each defendant's responsibility.[2] The result also seems to be influenced by viewing the second approach, pure several liability, as the only alternative. Under pure several liability, each tort-feasor is only liable for the same percentage of the plaintiff's damages as that tort-feasor's negligence is of the combined negligence of the plaintiff and all other concurrent tort-feasors. W. Prosser & P. Keeton, supra, Sec. 67 at 475; Sobelsohn, Comparing Fault, 60 Ind.L.J. 413, 455 (1985). Reverting to the hypothetical three-car accident involving equally at fault A, B, and C, the pure comparative fault system results in B's being responsible for only one-third of A's damages, even though A and B are equally at fault and A is able to collect nothing from insolvent C. Again, it seems to be assumed that the only alternative to this result is traditional joint liability.
 
 
 62
 The vice in both conventional joint liability and pure several liability is the same: each looks to the fault of third parties to measure the comparative fault of the plaintiff and the particular defendant, the extent of whose responsibility to the plaintiff is under consideration.
 
 
 63
 A third approach exists, however. For ease of reference, more than descriptive accuracy, it may be called "modified joint liability." Under it, the relevant comparison for comparative fault purposes is between the plaintiff's negligence and the negligence of the particular defendant, the extent of whose liability to the plaintiff is being fixed. In the mentioned three-car accident example, if C is insolvent, then A is nevertheless able to recover half of his damages from B, since A and B are equally at fault (which is the same result that would have obtained if C had not been at fault). In effect, the risk that C will not compensate plaintiff A (due to C's insolvency, or C's immunity from liability, or the fact finder's determination that what C did was not negligent) is borne by A and B in the respective ratios that the fault of each of them bears to the total fault of both. By contrast, traditional joint liability assigns this entire risk to defendant B, and pure several liability assigns it entirely to plaintiff A.
 
 
 64
 Though it has become significantly relevant only with the latter-day wide and rapid expansion of comparative fault, the concept of this third solution is itself not of as recent vintage. It was first suggested over fifty years ago by Charles O. Gregory, a professor of law at the University of Chicago. C. Gregory, Legislative Loss Distribution in Negligence Actions, 77-79, 142-48 (1936). Professor Gregory explained the rationale for his proposal:
 
 
 65
 "At common law joint tortfeasors are virtually guarantors of each other's solvency so far as concerns the injured plaintiff's joint judgment for damages; and the introduction of contribution between joint tortfeasors does not affect that situation in the slightest degree. The plaintiff receives his damages at all costs, leaving the defendants to even up the loss between themselves if and as they may and can. But under a comparative negligence statute, where the plaintiff, although negligent, may still recover, the situation is fundamentally different. Here absolutely no reason exists why the defendants, even if they are treated as joint tortfeasors and thus subjected to joint judgment liability for certain purposes, should be made to assume the entire risk of each other's insolvency with respect to plaintiff's recoverable damages. For when the plaintiff and the solvent tortfeasor are both negligent, they share the stigma which at common law seems to have furnished the justification for the somewhat arbitrary allocation of this risk on joint judgment debtors. Furthermore, it is quite possible to have a plaintiff who is as negligent as, or more negligent than, either of his defendants, but is still entitled to recover. Under such circumstances, it seems idle to suppose that a joint liability to the plaintiff should carry absolutely the same incidents as the common-law joint judgment; and distribution of the risk of insolvency of one of the joint defendants in accordance with the apportionment of fault would seem to be the only method of administration consistent with the terms of the comparative negligence statute." Id. at 142 (footnote omitted).
 
 
 66
 See also Fleming, Foreword: Comparative Negligence at Last--By Judicial Choice, 64 Calif. L.Rev. 239, 252 n. 55, 258 (1976) (praising what is here called modified joint liability and crediting Gregory as its originator).
 
 
 67
 In a comprehensive study of concurrent fault focusing primarily on Great Britain and Ireland, Professor Glanville Williams advocated modified joint liability as the proper method of apportioning damages when one of the tort-feasors had, for some reason, not been sued. G. Williams, Joint Torts and Contributory Negligence Sec. 110 at 414-20 (1951). Professor Williams implemented this approach when he drafted the Irish contribution statute. See Fleming, 64 Calif. L.Rev. at 252. Other commentators have been supportive. See Sobelsohn, 60 Ind. L.J. at 456 (noting that this approach is "[m]ore in keeping with the philosophy of proportionate responsibility"); Pearson, Apportionment of Losses Under Comparative Fault Laws--An Analysis of the Alternatives, 40 La. L.Rev. 343, 354, 362-65 (1980); Note, Reconciling Comparative Negligence, Contribution, and Joint and Several Liability, 34 Wash. & Lee L.Rev. 1159, 1174-76 (1977). But see F. Harper, F. James & O. Gray, supra Sec. 22.17 at 412-13 (noting "considerable support" for this approach but opposing it because defendants are more able to insure against losses). The Uniform Comparative Fault Act, section 2(d), 12 U.L.A. (West Supp.1987), incorporates this approach, and its principles were judicially adopted by the Missouri Supreme Court in Gustafson v. Benda, 661 S.W.2d 11, 15-16, 21-22 (Mo.1983) (en banc). See also Restatement (Second) of Torts Sec. 886A, comment i (1977) ("If one tortfeasor's equitable share turns out to be uncollectible it should be spread proportionately among the other parties at fault"). Cf. Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 429 n. 9 (Tex.1984) (describing this solution as "attractive" but rejecting it, in cases involving strict liability in tort, because of perceived problems of "post-trial jurisdiction and finality of judgments" that would arise in reallocating the share of an insolvent tort-feasor after trial).
 
 
 68
 We have found one reported appellate decision explicitly applying this approach. Haney Electric Co. v. Hurst, 624 S.W.2d 602 (Tex.Civ.App.--Dallas 1981, writ granted and then dismissed as moot). That case involved a three-car collision. In separate actions, two of the drivers--each later found to be thirty percent negligent--sued the third driver--later found to be forty percent negligent. The cases were consolidated, and one question was whether the defendant (the third driver, found forty percent at fault) should be liable to a particular plaintiff for forty percent of the harm (that is, only the defendant's share) or seventy percent (that is, the defendant's share added to the entire thirty percent share of the other plaintiff/tort-feasor, neither of the plaintiffs being also a defendant). The court adopted neither approach and chose instead to hold the defendant third driver liable to each plaintiff for 40/70ths of total damages. That fraction represented the ratio of the defendant's negligence (forty percent) to the total of his negligence and the negligence of the party seeking recovery (thirty percent). The court thus placed on defendant a portion of the unsued tortfeasor's share of fault, but only that portion represented by the ratio of the defendant's fault (forty percent) to the combined fault of the defendant and plaintiff (seventy percent). The court considered this result mandated not only by the Texas comparative negligence scheme, Tex.Rev.Civ.Stat. art. 2212a (codified as amended at Tex.Civ.Proc. & Rem.Code Sec. 33.001 (Vernon 1986)), but also by "[e]lementary fairness." 624 S.W.2d at 612; see also Koonce v. Quaker Safety Products & Manufacturing Co., 798 F.2d 700, 713 n. 17 (5th Cir.1986).
 
 
 69
 Modified joint liability in this context thus limits the maximum liability to the plaintiff of each individual joint tort-feasor to the amount for which that particular tort-feasor would have been liable to the plaintiff if only the negligence of such party and the negligence of the plaintiff were compared. If the plaintiff is not negligent, this "limit" will necessarily be one hundred percent of all the damages suffered by the plaintiff, and the result will be no different than in traditional joint liability. Accordingly, if modified joint liability is to come into play there must, at the least, be a regime of comparative fault, and the plaintiff and not less than two other actors (neither of whom is vicariously liable for the fault of the other) must each be guilty of causative fault. Assuming, as is the case here, that all these actors are before the court and none has settled with the plaintiff, the operation of modified joint liability may be again illustrated by another three-party example (using a different damages figure and another set of percentages).
 
 
 70
 If plaintiff A, who suffers total damages of $100,000, is twenty percent negligent, and defendant B is likewise twenty percent negligent, while defendant C's negligence is sixty percent, then modified joint liability limits B's maximum exposure to $50,000 (20/40ths of $100,000) and likewise limits C's maximum exposure to $75,000 (60/80ths of $100,000). However, plaintiff A'stotal recovery from both B and C may not exceed A's total damages ($100,000),less the percentage (twenty percent) thereof which his fault is of the total fault of all parties (A, B, and C) including himself; and thus in this instance, A's combined recovery from B and C may not exceed $80,000 ($100,000, less $20,000). To effectuate this limitation on A's overall recovery, as well as the referenced limitations on the maximum exposures of B and C, respectively, the judgment will provide for some several liability and some joint and several liability. Plaintiff A will be awarded a total judgment of $80,000, composed of the following: $5,000 against B alone; plus $30,000 against C alone; plus $45,000 against B and C jointly and severally. Under such a judgment, B's maximum exposure is $50,000 ($5,000, plus $45,000), which is half of A's total damages and corresponds to the fraction which B's negligence is of the combined negligence of A and B (20/40ths); C's maximum exposure is $75,000 ($30,000, plus $45,000), which is seventy-five percent of A's total damages and corresponds to the fraction which C's negligence is of the combined negligence of A and C (60/80ths); and, A's maximum recovery is $80,000 ($5,000, plus $30,000, plus $45,000), which is eighty percent of his total damages ($100,000) and reflects the deduction therefrom for his twenty percent share of the combined negligence of all three parties (A, B, and C) at fault.[3] Appropriate provision will also need to be made in the judgment for contribution: to the extent B pays A more than $20,000 on the entire judgment, B will have judgment over for the excess against C; and to the extent that C pays A more than $60,000 on the entire judgment, C will have judgment over for the excess against B.[4]
 
 
 71
 As applied to the Simeons' claims against Smith and Lumar, calculation of the appropriate modified joint liability judgment is rendered uniquely complicated by the fact that Simeon's total damages are $150,000 greater in his claim against Smith than in his claim against Lumar (due entirely to the difference in the pain and suffering awards as respectively made by the jury in the action against Smith and by the court in the action against Lumar). Nevertheless, the task can be accomplished. Assuming Simeon accepts our remittiturs so that his total damages in the claim against Smith are $706,487.50 and his total damages in the claim against Lumar are $556,487.50, and based on Simeon's ten percent negligence, Smith's thirty-eight percent, and Lumar's thirty-two percent, the liabilities of the parties should be as set out below.
 
 
 72
 Simeon's maximum recovery from both Smith and Lumar should be $628,779.93, calculated as follows. Of the $556,487.50 total Simeon damages common to the actions against both Smith and Lumar, Simeon may recover from all sources ninety percent thereof, or $500,838.75. As to the additional $150,000 of Simeon's total damages which were fixed only in the claim against Smith, Simeon is entitled to additionally recover from Smith 58/68ths (Smith's negligence as a fraction of the total negligence of Smith and Simeon) thereof, or $127,941.18. The total of these sums ($500,838.75 plus $127,941.18) is the full $628,779.93 which Simeon is entitled to recover, in part from Lumar alone, in part from Smith alone, and in part from Lumar and Smith jointly and severally. Lumar's maximum liability to Simeon is for the sum of $423,990.44, which represents 32/42nds (Lumar's negligence as a fraction of the total negligence of Simeon and Lumar) of the $556,487.50 total Simeon damages common to the Smith and Lumar claims. Smith's maximum liability is for the sum of $602,592.28, which represents 58/68ths (Smith's negligence as a fraction of the total negligence of Simeon and Smith) of the $706,487.50 total Simeon damages fixed in the Smith claim. For purposes of contribution, Lumar should have recovery over from Smith if Lumar pays more than $178,076 (Lumar's thirty-two percent of the $556,487.50 total Simeon damages fixed in the claim against Lumar), and Smith should have recovery over from Lumar if Smith pays more than $450,703.93 ($127,941.18, as Simeon's maximum recovery on the additional $150,000 total damages in the Smith action for which Lumar has no responsibility, plus $322,762.75 constituting Smith's fifty-eight percent of the $556,487.50 total Simeon damages common to both claims).
 
 
 73
 To carry the foregoing into effect, the appropriate judgment would award Simeon a total of $628,779.93, composed of: (A) $26,187.65 against Lumar alone; plus (B) $204,789.49 against Smith alone; plus (C) $397,802.79 against Smith and Lumar jointly and severally.[5] Lumar, whose maximum potential exposure (if Smith pays nothing to Simeon) is thus $423,990.44 ((A) plus (C)), would have judgment over against Smith for any payments by Lumar in excess of $178,076; Smith, whose maximum potential exposure (if Lumar pays nothing to Simeon) is thus $602,592.28 ((B) plus (C)), would have judgment over against Lumar for any payments by Smith in excess of $450,703.93.
 
 
 74
 As to Mrs. Simeon's loss of consortium claim, the appropriate judgment against Lumar, the only party liable in this respect, is far easier to calculate. Mrs. Simeon's total damages were $80,000 and, as the majority holds (majority opinion at note 14 and accompanying text) and she does not question, she is properly chargeable with Simeon's ten percent negligence. The majority holds Lumar liable to Mrs. Simeon for ninety percent of the $80,000 (or $72,000). But Lumar was only thirty-two percent negligent, and should be liable only for 32/42nds of the $80,000 (or $60,952.38). That is the ratio which the negligence of Lumar bears to the total negligence of Mrs. Simeon (as imputed) and Lumar. Smith's negligence (fifty-eight percent) is legally irrelevant and Lumar is not vicariously or derivatively liable for Smith's conduct.
 
 
 75
 The adoption of comparative fault is generally regarded as an advance in the law, for it avoids the absurd result of an injured plaintiff, who is only slightly negligent, being unable for that reason to recover anything from a defendant whose fault is ten times as great as the plaintiff's. Should we not likewise avoid the equal absurdity in the opposite direction of allowing a slightly negligent defendant to be liable for eighty-nine percent of the damages of a plaintiff who is ten times more at fault than that defendant.
 
 
 76
 It must be understood that what is of concern here is not shifting fault or responsibility for damages to or from or among multiple tort-feasor defendants. Indeed, the exact opposite is the case, for the thrust of this partial dissent is that the presence or absence of third-party fault is irrelevant, just as it was at common law. Comparative fault, which comes into play only if the plaintiff is guilty of fault which is a cause of all his damages, says that the plaintiff's fault is to be compared to something. The key question is to what? I suggest that the only logical comparison is to (and only to) the fault of the (or each) defendant from whom the plaintiff seeks recovery (whether the sole defendant or tort-feasor or one of several); if the plaintiff and the defendant are equally at fault, the defendant is responsible for one-half the plaintiff's damages, and the defendant's responsibility to the plaintiff is neither enhanced nor reduced by whether or not some third person is also guilty of causative fault.
 
 
 77
 Let us examine a variation of an earlier example. In the three-car accident involving plaintiff A, defendant B, and third driver C, assume that the accident is caused by the speed at which each of the three cars is traveling and that the speed of A and B is each equally negligent and excessive. C (for whose actions B is not vicariously liable) is traveling within the speed limit but at a rate which is arguably too fast due to the slick condition of the road. Why should B be responsible for a larger fraction of A's total damages if the jury finds that C's admitted speed was negligent than if the jury does not so find? A finding that C's speed was negligent does not change the relationship between the negligence of A and B; and it does not imply any enhancement of A's damages.[6] The comparison should only be between A and B. B's liability to A should be the same (one-half of A's damages) whether the fault is fifty percent B's and fifty percent A's, or forty percent B's, forty percent A's, and twenty percent C's. The majority would have defendant B's total exposure (for the same damages) go up as his percentage of the total negligence goes down, and even though his negligence relative to that of plaintiff A does not change.[7] No one has adequately explained the reason or justice of such a quixotic result.[8]
 
 
 78
 Even if, as I firmly believe, modified joint liability is the fairest and most appropriate rule, the question remains whether this Court is free to adopt it or is constrained from doing so by principles of stare decisis and a proper appreciation of the judicial function and our role as an intermediate appellate court. Though these considerations are of the utmost importance, I conclude that they do not preclude our adoption of modified joint liability.
 
 
 79
 I begin by observing that "[a]dmiralty law is judge-made law to a great extent ...," Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979), and that "the Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime...." United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975) (replacing divided damages rule with comparative fault). As an admiralty court we are not constricted by some comparative fault statute that might be construed to expressly or impliedly require traditional joint liability. The judicial development of admiralty law is in few situations legislatively strait-jacketed.
 
 
 80
 For example, though for centuries maritime law required negligence as a basis for recovery (absent unseaworthiness), the federal judiciary in relatively recent years has incorporated strict liability in tort, doing away with the requirement of negligence, in maritime products liability cases. Nor did this development wait upon the initiative of the Supreme Court. As that Court explained in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986):
 
 
 81
 "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies.... Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules.
 
 
 82
 "....
 
 
 83
 "We join the Courts of Appeals in recognizing products liability, including strict liability, as part of the general maritime law." (Emphasis added; footnotes omitted.)
 
 
 84
 The Supreme Court thus approved what "the Courts of Appeals" had already done, without waiting for word from the high court, to change and adopt a new rule contrary to well established prior practice.
 
 
 85
 We are aware of no maritime law case where modified joint liability has been considered explicitly and rejected. Indeed, there are relatively few maritime cases where the question might even be raised. What is needed is a case with multiple tort-feasors and a plaintiff who is contributorily negligent. Often there may be third-party tort-feasors whose fault is not inquired about because they may be insolvent, or protected by some special immunity or not subject to jurisdiction, and the parties to the suit have simply assumed that the absent party's fault, if any, was irrelevant to their rights inter se.
 
 
 86
 In Gele v. Chevron Oil Co., 574 F.2d 243, 251 (5th Cir.1978), our Court simply stated that a contributorily negligent plaintiff could "collect all his damages from one party in the event he is unable to obtain the relative portion of damages from each party at fault." There was no discussion of alternative methods of apportioning fault. In Empire Seafoods, Inc. v. Anderson, 398 F.2d 204, 217 n. 21 (5th Cir.), cert. denied, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968), we held that a contributorily negligent plaintiff could recover his damages from a single concurrent tort-feasor defendant. Again, however, no consideration was given to the notion of modified joint liability. In Drake Towing Co. v. Meisner Marine Construction Co., 765 F.2d 1060, 1067 (11th Cir.1985), the Eleventh Circuit held that a contributorily negligent plaintiff could "recover its entire damages, less that proportion attributable to its own fault" from one of two concurrent tort-feasors. Drake actually lends some support to the notion of modified joint liability because one of the tort-feasors was not a party and, therefore, it was held error to consider that tort-feasor's comparative share of fault. Instead, Drake held that only the negligence of the plaintiff and the party defendant could be considered. Id. at 1067, 1068 (alleged negligence of unjoined third party "irrelevant," and liability between plaintiff and defendant must be apportioned "without considering the negligence of" the unjoined third party).[9]
 
 
 87
 In Joia v. Jo-Ja Service Corp., 817 F.2d 908 (1st Cir.1987), a maritime case much like this, the First Circuit held a thirty percent negligent defendant jointly liable with a sixty-five percent negligent co-defendant for ninety-five percent of the total damages of the five percent negligent plaintiff. Joia viewed its choices as limited to either making each of the two defendants pay only its own percentage of the total fault of all three parties, or holding the two defendants both jointly liable for ninety-five percent of the plaintiff's total damages. The Court did not discuss modified joint liability. See id. at 915-17. Like us, the First Circuit in Joia found little direct authority on the question. However, it stated that "Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), though[ ] not controlling, states the admiralty rule applicable here." 817 F.2d at 916.
 
 
 88
 In Edmonds, a longshoreman brought a negligence action against the owner of the ship on which he was working. 33 U.S.C. Sec. 905(b). The jury found the plaintiff to be ten percent negligent and the shipowner twenty percent negligent. The plaintiff's employer, against whom the longshoreman's direct claim was barred by the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Sec. 901 et seq., was found to be seventy percent negligent. The question in Edmonds was whether the shipowner should be liable for only its own share of all fault, twenty percent, or whether it should be liable for ninety percent, its own twenty percent plus the employer's seventy percent share. The Supreme Court held that the shipowner must pay ninety percent of the plaintiff's damages. In Edmonds, the Supreme Court expressed its reluctance to upset the "delicate balance" struck by Congress between the rights of longshoremen, stevedores, and shipowners in the 1972 Amendments to the LHWCA. 99 S.Ct. at 2763. The Court observed that it dealt "with an interface of statutory and judge-made law." Id. at 2762. The Court noted various inequities that would prevail if the shipowner were liable only for its own twenty percent share of all negligence, id. at 2761, and thought its rule preferable to this alternative. The opinion does not address, much less reject, the possibility of applying the modified joint liability rule here advocated. It does not even acknowledge the existence of such a third approach.
 
 
 89
 Analysis of some of the language in Edmonds may be helpful. In introducing the questions before it, the Supreme Court stated:
 
 
 90
 "As that [admiralty] law had evolved by 1972, a longshoreman's award in a suit against a negligent shipowner would be reduced by that portion of the damages assignable to the longshoreman's own negligence; but, as a matter of maritime tort law, the shipowner would be responsible to the longshoreman in full for the remainder, even if the stevedore's negligence contributed to the injuries. This latter rule is in accord with the common law, which allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident." Id., 99 S.Ct. at 2756 (emphasis added; footnotes omitted).
 
 
 91
 The expression "even if" introducing the concluding clause of each of the above sentences is suggestive of the Court's assumption that the negligence of the stevedore, or other third party, might normally be thought to reduce the liability of the shipowner (or other primary defendant). The phraseology is certainly at odds with any recognition of the idea that the stevedore's fault should be put into the equation to increase the percentage of fault for which the shipowner would otherwise be responsible to the negligent plaintiff. All the Court is saying is that the negligence of the stevedore does not decrease the responsibility of the shipowner. That is wholly consistent with modified joint liability.
 
 
 92
 In a footnote appended to the first sentence in the above passage, the Court remarked:
 
 
 93
 "We stated the common-law rule in The Atlas [93 U.S. 302, 23 L.Ed. 863 (1876) ] and adopted it as part of admiralty jurisprudence: 'Nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue in a common-law action all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss.' " Edmonds, 99 S.Ct. at 2756 n. 7 (quoting The Atlas, 93 U.S. at 315) (emphasis added).
 
 
 94
 Obviously, this does not address the question of whether the plaintiff's negligence is to be compared to that of the (or each) defendant from whom he seeks recovery or to that of all concurrent tort-feasors collectively.
 
 
 95
 In a note called for at the conclusion of the above passage, the Court observed:
 
 
 96
 "A tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury. 'Nor are the damages against him diminished.' Restatement [ (Second) of Torts], supra, Sec. 879, Comment a." 99 S.Ct. at 2756 n. 8.
 
 
 97
 The quoted passage tends to confirm this dissent's analysis that joint liability is not predicated on one tort-feasor's being liable for the wrongs of another, but rather on the concept that each tort-feasor is responsible for all the results of his own wrong, and that whether some third party--through fault or otherwise--also contributed thereto is simply irrelevant.[10]
 
 
 98
 In a subsequent footnote, Edmonds spoke to the problem of the absence of contribution:
 
 
 99
 [T]he general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury. Normally, the chosen tortfeasor may seek contribution from another concurrent tortfeasor. If both are already before the court--for example, when the plaintiff himself is the concurrent tortfeasor or when the two tortfeasors are suing each other as in a collision case like [U.S. v.] Reliable Transfer [Co., Inc.] [421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) ]--a separate contribution action is unnecessary, and damages are simply allocated accordingly. But the stevedore is not a party and cannot be made a party here, so the Reliable Transfer contribution shortcut is inapplicable. Contribution remedies the unjust enrichment of the concurrent tortfeasor [citation omitted], and while it may sometimes limit the ultimate loss of the tortfeasor chosen by the plaintiff, it does not justify allocating more of the loss to the innocent employee, who was not unjustly enriched. [Citation omitted.] Our prior cases recognize that. Even before Reliable Transfer, we apportioned damages between vessels that collided and sued one another. Reliable Transfer merely changed the apportionment from equal division to division on the basis of relative fault. But we did not upset the rule that the plaintiff may recover from one of the colliding vessels the damage concurrently caused by the negligence of both." 99 S.Ct. at 2762 n. 30 (final emphasis in original).
 
 
 100
 Here again, the Court is addressing the question of whether the third party's fault can diminish the plaintiff's recovery from "the chosen tortfeasor." Again, the answer is "no." And "the innocent" plaintiff can recover all his damages from either tort-feasor. But, as before, the question of whose negligence the plaintiff's negligence is compared to is simply not adverted to or even recognized.
 
 
 101
 There is simply nothing in the language or reasoning of Edmonds which is inconsistent with modified joint liability. Admittedly, the result in Edmonds would have been otherwise under modified joint liability.[11] But Edmonds was an LHWCA action, and as we have noted, this was given particular significance by the Court. Moreover, the modified joint liability approach was neither before the court nor even recognized by it. In these circumstances, I would be guided by the principle that "[i]t is not to be thought that a question not raised by counsel or discussed in the opinion of the court has been decided merely because it existed in the record and might have been raised or considered." United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 419-20, 70 L.Ed. 799 (1926). See also Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925).[12]
 
 
 102
 In sum, I agree with the First Circuit's Joia that Edmonds is not directly controlling outside of the LHWCA context. But I disagree with any implication from Joia--which itself did not even recognize the existence of the modified joint liability alternative--that Edmonds prevents this Court from adopting modified joint liability in the present case.
 
 
 103
 Admittedly, modified joint liability is inconsistent with the result or practice in some prior cases. I submit, however, that in a more real world sense there has been no really fixed and largely consistent or widespread conscious understanding or practice on the part of either bench or bar in this respect. Indeed, my impression is that, over the years, most plaintiffs' lawyers have not (absent some arguable vicarious liability theory) sought to secure findings on third-party fault in the thought that this will increase the percentage of negligence for which the target tort-feasor defendant would otherwise be responsible in the event the plaintiff is found contributorily negligent, and that in similar circumstances most damage suit defense counsel have not hestitated, on the basis of any such concern, to attempt to secure findings of third-party fault. I believe that modified joint liability is a reasonable, fair, and just rule which logically flows from and accommodates the interplay of the principles of comparative fault and the responsibility of each party for all the proximate results of his own delicts. The adoption of modified joint liability would represent interstitial legal evolution in the appropriate common-law tradition, a tradition that in the maritime context reaches to the present.
 
 
 104
 Accordingly, I respectfully dissent from part IVD of the majority opinion and from so much of its part VI(b) as holds Lumar liable for ninety percent, instead of 32/42nds, of Mrs. Simeon's loss of consortium damages.
 
 
 105
 KING, Circuit Judge, with whom JERRE S. WILLIAMS, Circuit Judge, joins specially concurring:
 
 
 106
 I concur fully in the majority opinion.
 
 
 107
 The majority opinion holds the defendants jointly and severally liable, to the extent of their respective liabilities, for Simeon's injuries. In dissent, Judge Garwood expresses his dissatisfaction with this result. Although Judge Garwood agrees that the liability of Smith and Lumar should not be entirely several, it is his opinion that Simeon's contributory negligence makes the "traditional" joint and several liability imposed in the majority opinion "inappropriate." According to Judge Garwood, what is appropriate--meaning, in his estimation, more fair and reasonable--is to determine each defendant's liability using a "modified" version of joint liability. I write separately to explain why, despite Judge Garwood's appeal to fairness and reasonableness, I cannot join with him in his attempt to implement modified joint liability in this case.
 
 
 108
 To understand why I reject Judge Garwood's proposal, it is necessary to first understand the changes that accepting his proposal would work and the backdrop against which those changes would be carried out. First, the changes: If all defendants are solvent, a plaintiff should, under both systems, finally recover the same amount--the total amount of the judgment minus that amount which represents the plaintiff's contributory negligence.[1] A difference between the two systems when the defendants are solvent, however, comes in the manner in which recovery of this amount may be made. Under a traditional joint and several liability system, a plaintiff can recover from any defendant the entire amount which all of them owe him. But under the proposed system of modified joint liability, the amount that a plaintiff can recover from any one defendant is restricted by more than just the plaintiff's contributory negligence; it is also restricted by the relationship between the individual defendant's negligence and the plaintiff's contributory negligence. Therefore, under the system Judge Garwood proposes, a plaintiff can recover as a total from all defendants an amount equal to the entire judgment minus the plaintiff's contributory negligence, but cannot recover from any one defendant an amount more than "the same fraction that that defendant's negligence is of the total negligence of the plaintiff and that particular defendant." The system is implemented by entering judgment jointly in an amount which is less than the maximum amount for which any individual defendant is liable, and judgment severally for each defendant in an amount equal to the maximum that individual defendant owes (when measured by the "same fraction" comparison) minus the amount for which he has been found to be jointly liable.[2]
 
 
 109
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 110
 "Modifying" traditional principles of joint and several liability as Judge Garwood suggests, therefore, would work at least one clear change: Since a defendant's joint liability would become defined by a sum which is less than the total amount of the defendants' combined liabilities, a plaintiff could recover the total amount he is owed only by enforcing the judgment against each and every defendant. More importantly from Judge Garwood's point of view, this change would necessarily work a second change should any one defendant become insolvent (or for any other reason fail to pay its share of the judgment): A plaintiff would be unable to recover, even if he enforced the judgment against every remaining defendant, that which he could recover from any one remaining defendant under traditional joint and several liability--the total amount of the judgment minus that amount which represents the plaintiff's contributory negligence.
 
 
 111
 Understanding that modified joint liability alters the way in which a plaintiff collects his judgment and, in some cases, decreases the total amount of the judgment a plaintiff would finally receive, is, however, only the first step toward understanding the ramifications of the system Judge Garwood proposes. The second step is understanding the backdrop against which the modification would be played out. In this case, Simeon obtained recovery from Lumar and Smith under two separate and different theories. Following Judge Garwood's suggestion to adopt modified joint liability would, therefore, change the theory of liability and, consequently, the manner and amount of recovery for two categories of claims--Jones Act claims and general maritime claims. That concerns me. Simply put, I do not agree with Judge Garwood that we are free to modify the traditional rule of joint and several liability under the Jones Act or that we should modify it under general maritime law.
 
 
 112
 Judge Garwood finds the freedom to implement a modified system of joint liability in three basic propositions. First is the proposition that "[a]s an admiralty court we are not constricted by some comparative fault statute that might be construed to expressly or impliedly require traditional joint liability." Second is the proposition that "the Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime." Third is the proposition that neither the Supreme Court nor this court has ever, in the process of adhering to traditional joint and several liability, specifically rejected the modified version proposed today. I, however, disagree with the truth of the first proposition and find less freedom in the second and third propositions than Judge Garwood does. I begin with the first proposition and Simeon's Jones Act claim.
 
 
 113
 The Jones Act, of course, gives a congressionally prescribed, statutory remedy to "[a]ny seaman who shall suffer personal injury in the course of his employment." 46 U.S.C.App. Sec. 688(a). In defining the scope of the remedy which the Jones Act affords, Congress specifically decreed that "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply." Id. Consequently, as the majority opinion explains, the Jones Act incorporates the Federal Employers' Liability Act ("FELA")--a statute whose federal rights are defined in part by the FELA's specific statutory provisions and in part by the common law. By incorporating the FELA into the Jones Act, the Supreme Court has explained, Congress meant that "those contingencies against which Congress has provided to ensure recovery to railroad employees should also be met in the admiralty setting." Cox v. Roth, 348 U.S. 207, 209, 75 S.Ct. 242, 244, 99 L.Ed. 260 (1955). One of the assurances of recovery which the FELA provides railroad employees is that "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee...." 45 U.S.C. Sec. 53. In other words, the FELA expressly "imposes comparative fault principles by congressional enactment" and therefore, to meet the same contingencies for Jones Act plaintiffs, so does the Jones Act. Chotin Transp., Inc. v. United States, 819 F.2d 1342, 1350-51 n. 5 (6th Cir.1987); accord 1B S. Bellman, A. Jenner, B. Chase, J. Loo & H. Prival, Benedict on Admiralty Sec. 25 (7th ed. 1986); 2 M. Norris, The Law of Seamen Sec. 30:42 (4th ed. 1985). See also In re Roy Crook & Sons, Inc. v. Allen, 778 F.2d 1037, 1040 (5th Cir.1985) (holding that "Section 53 of the FELA is part of the Jones Act"); Neal v. Saga Shipping Co., S.A., 407 F.2d 481, 485 (5th Cir.), cert. denied, 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969) (same).
 
 
 114
 Because of section 53 of the FELA, I cannot agree with Judge Garwood's assertion that we are not, in this case, faced with a comparative fault statute and, therefore, are not constricted from modifying the traditional rule of joint and several liability; with respect to the Jones Act claim, we are faced with a comparative fault statute and, I think, one that is very constricting. Section 53 of the FELA explicitly expresses Congress' intent that a plaintiff should recover the total amount of the judgment minus only that amount which represents the plaintiff's contributory negligence, with no exception made for cases in which one or more defendants either do not or cannot pay their share of the judgment. As I explained above, one change which Judge Garwood's "modified" system of joint liability would work--in fact, the change which it is specifically designed to work--would be to diminish, when a defendant does not pay, a contributorily negligent plaintiff's recovery below the point the statute provides. It is clear to me, therefore, that Judge Garwood's system would alter the assurance of recovery to Jones Act plaintiffs which Congress provided by incorporating the FELA into the Jones Act. Under my understanding of this court's role in our tripartite system of government, we simply cannot--when it would undermine that which Congress specifically chose to do--do that which Congress failed to do.
 
 
 115
 Even if the FELA's comparative fault provision did not stay my hand in modifying traditional joint and several liability under the Jones Act, I would still find it necessary to reject Judge Garwood's proposal with respect to that claim. As the majority opinion explains, unless the FELA dictates otherwise, the Jones Act is construed in accord with the common law. Without the statutory impediment of section 53, therefore, the issue would shift from whether our role as an enforcer of congressional intent prevents us from modifying the principles of joint and several liability under the Jones Act to whether principles of stare decisis cut off the course Judge Garwood would have us take. That issue is resolved, I find, by a fair reading of the Supreme Court's decision in Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).
 
 
 116
 Edmonds was a longshoreman; he was injured while unloading cargo for a shipowner who had contracted with Edmonds' employer, a stevedoring concern, for Edmonds' work. Because of the injury, Edmonds received benefits from his employer under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). He also sued the shipowner for negligence under 33 U.S.C. Sec. 905(b), a provision of the LHWCA added by Congress in 1972 to specifically authorize such suits. At trial, the jury returned the following verdict: Total damages to Edmonds were $100,000; responsibility for those damages was divided between Edmonds (10%), the employer (70%), and the shipowner (20%). The district court implemented the verdict by reducing Edmonds' recovery by his own negligence (10%). The court could not, however, permit Edmonds to recover any of the judgment from the employer--the employer was not a party to the suit because the LHWCA specifically limited its liability. Therefore, despite the fact that the shipowner was only 20% responsible for Edmonds' injuries, the district court held the shipowner responsible for the remaining 90% of Edmonds' damages. The shipowner appealed, finally reaching the United States Supreme Court.
 
 
 117
 To the Court, the shipowner made two arguments: (1) that in the process of specifically authorizing negligence suits against shipowners through the LHWCA's 1972 amendments, Congress limited a shipowner's liability to only that proportion of plaintiff's damages which the shipowner actually caused--in this case, 20%; and (2) that even if Congress did not decree proportionate liability, the Supreme Court should, using its authority to fashion general maritime law, limit the shipowner's liability to its proportionate share of the longshoreman's damages. The Supreme Court began its examination of the arguments by remarking that "[a]dmiralty law is judge-made law to a great extent" and that prior to 1972, a longshoreman's negligence action against a shipowner was recognized by general maritime law, not by statute. Id. at 259-60, 99 S.Ct. at 2755-56. The way in which general maritime law fashioned an injured plaintiff's recovery prior to 1972, the Court explained, was decided when the Supreme Court added traditional joint and several liability to that body of law in 1876:
 
 
 118
 We stated the common-law rule in The Atlas and adopted it as part of admiralty jurisprudence: "Nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue in a common-law action all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss."
 
 
 119
 Id. at 260 n. 7, 99 S.Ct. at 2756 n. 7 (quoting The Atlas, 93 U.S. 302, 315, 23 L.Ed. 863 (1876)). Importantly, although The Atlas was not a case in which the plaintiff was contributorily negligent in causing the injury for which recovery was sought from the defendants, the Court made it clear that a plaintiff's contributory negligence had never changed the traditional rule:
 
 
 120
 As [admiralty law] had evolved by 1972, a longshoreman's award in a suit against a negligent shipowner would be reduced by that portion of the damages assignable to the longshoreman's own negligence; but, as a matter of maritime tort law, the shipowner would be responsible to the longshoreman in full for the remainder, even if the stevedore's negligence contributed to the injuries. This latter rule is in accord with the common law, which allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident.
 
 
 121
 Id. at 259-60, 99 S.Ct. at 2755-56.
 
 
 122
 After establishing the state of the law prior to the LHWCA's 1972 amendments, the Court turned its attention to the amendments themselves and their effect on the judicially-created doctrine of joint and several liability; an analysis of the amendments led the Court to conclude that Congress had not upset the " 'long-established and familiar principl[e]' of maritime law by imposing a proportionate-fault rule." Id. at 263, 99 S.Ct. at 2758. The Court moved, therefore, to the remaining issue: whether it was "free to and should change [the shipowner's] role so as to make the vessel liable only for the damages in proportion to its own negligence" when a longshoreman sues the vessel owner for negligence under the LHWCA. Id. at 271, 99 S.Ct. at 2762. To this question, the Court answered "no":
 
 
 123
 Though we recently acknowledged the sound arguments supporting division of damages between parties before the court on the basis of their comparative fault, see United States v. Reliable Transfer Co., 421 U.S. 397 [95 S.Ct. 1708, 44 L.Ed.2d 251] (1975), we are mindful that here we deal with an interface of statutory and judge-made law.... By now changing what we have already established that Congress understood to be the law, and did not itself wish to modify, we might knock out of kilter this delicate balance. As our cases advise, we should stay our hand in these circumstances. Once Congress has relied upon conditions that the courts have created, we are not as free as we would otherwise be to change them. A change in the conditions would effectively alter the statute by causing it to reach different results than Congress envisioned.
 
 
 124
 Id. at 271-72, 99 S.Ct. at 2762 (footnote and citations omitted).
 
 
 125
 These passages from Edmonds explain why I believe that more than section 53 of the FELA constrains this court from modifying the traditional rule of joint and several liability in the Jones Act context.[3] The Supreme Court set down in Edmonds a general principle that I, as a member of an inferior court, am obliged to follow: Even though the judiciary has the power to alter the common law of admiralty, it should not use that power to change traditional rules of liability, and specifically the traditional rule of joint and several liability, when to do so would affect an "interface of statutory and judge-made law"--that is, a statute whose provisions are defined in part by Congress and in part by the common law of admiralty. That the principle applies in this case just as it did in Edmonds is, to me, beyond doubt. We are focused, of course, on the same traditional rule which concerned the Court in Edmonds. In addition, we deal with an "interface of statutory and judge-made law" as surely as did the Court in Edmonds; the only difference--and it is a difference without distinction--is that here, common law and statutory law interface within the structure of the Jones Act instead of within the LHWCA. Nor, as we explained above, can there be any doubt that the modification which Judge Garwood proposes changes the law of joint and several liability; as would have been the case by adopting proportionate liability in Edmonds, therefore, by adopting Judge Garwood's proposal, this court would be changing what "Congress understood to be the law" and effectively altering a statute "by causing it to reach different results than Congress envisioned." As I read Edmonds, that we cannot do.
 
 
 126
 It is clear from his dissent, however, that Judge Garwood has a different opinion about the reach of Edmonds than I do. While I focus on the general principle which led the Court to its conclusion in Edmonds, Judge Garwood focuses on the conclusion without reference to the general principle. The precise holding of Edmonds, Judge Garwood points out, is simply that a court cannot apply a proportional liability rule in place of joint and several liability in an LHWCA action for negligence brought by a longshoreman against a shipowner. That holding, Judge Garwood says, does not confine us here. More specifically, Judge Garwood argues, since negligence claims under the LHWCA are the only claims explicitly discussed in Edmonds, Edmonds says nothing about negligence claims under the Jones Act. Similarly, since replacing traditional joint and several liability with proportional liability was the only action the Supreme Court specifically forbade courts from taking, Edmonds does not prevent courts from abandoning traditional joint and several liability in favor of the modified joint liability theory Judge Garwood urges. There is a problem, I think, with Judge Garwood's attempt to limit Edmonds by distinguishing its facts and ignoring, without distinguishing, its governing principles: the concept of stare decisis, as it relates to the duty which inferior courts owe to the decisions of the Supreme Court, does not permit it. See Hutto v. Davis, 454 U.S. 370, 374-75, 102 S.Ct. 703, 705-06, 70 L.Ed.2d 556 (1982). As Judge Higginbotham recently explained:
 
 
 127
 Obedience by inferior courts to the command of the Supreme Court is essential to the administration of our complex court structure. For the Supreme Court to fulfill its unique role set by Article III, the federal system simultaneously must encourage candid expression by inferior courts while demanding acceptance of the Supreme Court's role as the final arbiter.... As an inferior court we must not allow our version of a "correct" result to deceive us into semantic games of reformulation and hair splitting in order to escape the force of a fairly resolved issue.
 
 
 128
 The notion that as an inferior court we are free to strip content from principle by confining the Supreme Court's holding to the precise facts before it is a heady assertion indeed; that notion ignores our role. Our duty to the Supreme Court precedent is broader than our duty to abide our own precedent and that of courts on our level. When the duty of obedience flows horizontally and not vertically, a later court may appropriately after due regard for our necessary dependence upon panel harmony in a multi-panel court and to the values of stare decisis such as predictability and settlement of expectation, confine the first case to its facts by concluding, in the words of Karl N. Llewellyn, that: "This rule holds only to redheaded Walpoles in pale magenta Buick cars." Our duty is different when the reach of precedent is vertical.
 
 
 129
 Bhandari v. First Nat. Bank of Commerce, 829 F.2d 1343, 1352 (5th Cir.1987) (en banc) (Higginbotham, J., specially concurring). I believe the principle which led the Court in Edmonds to refrain from tampering with the rule of traditional joint and several liability under the LHWCA applies equally to the Jones Act claim Simeon has brought before us. Consequently, since the modification to the existing rule of joint and several liability which Judge Garwood proposes is contrary to that principle, I reject--as I must--the modification with respect to Simeon's Jones Act claim.
 
 
 130
 Along with his Jones Act claim against Smith, however, Simeon brought a general maritime claim against Lumar. This general maritime claim, being of purely judicial creation, is not subject to the statutory constraints--or, therefore, the stare decisis restraints which grew out of statute-related concerns--that I believe prevent this court from changing the rule of traditional joint and several liability under the Jones Act. In fact, as Judge Garwood points out, this court's power to modify general maritime law is great; instead of asking whether we can modify the traditional rule of joint and several liability, therefore, the question with respect to Simeon's general maritime claim is whether we should modify the traditional rule as Judge Garwood suggests. Judge Garwood argues in favor of modified joint liability because it is "a reasonable, fair, and just rule which logically flows from and accommodates the interplay of the principles of comparative fault and the responsibility of each party for all the proximate results of his own delicts." There exists, however, no unequivocal measure of what is reasonable, fair, and just. Consequently, a statement that a rule of law is reasonable, fair, or just is simply a reflection that the rule advances a policy that the person judging the rule advocates. It is, therefore, to support a particular policy that Judge Garwood proposes today that we modify the traditional rule of joint and several liability under general maritime law; however, because I am unconvinced that the policy Judge Garwood advocates should be given priority over the policy the traditional rule presently advances, I reject the modification at this time.
 
 
 131
 The policy Judge Garwood advocates is that each party--including a contributorily negligent plaintiff and all joint tortfeasor defendants--should ultimately bear, to the extent possible, responsibility only for the proximate results of its own transgressions. I do not doubt that modified joint liability furthers that policy better than traditional joint and several liability does. As Charles O. Gregory, who first proposed the modified system fifty years ago explained, modified joint liability distributes among the contributorily negligent plaintiff and each remaining defendant, in proportion to the fault the plaintiff and each defendant bear to each other, the risk that any joint tortfeasor will be insolvent--something traditional joint and several liability does not do. See C. Gregory, Legislative Loss Distribution in Negligence Actions 142 (1936). The policy Judge Garwood would advance through modified joint liability, however, is fundamentally at odds with a competing policy that the traditional rule of joint and several liability furthers--that of ensuring that injured plaintiffs are made whole. Traditional joint and several liability furthers this policy, as Justice Blackmun observed in Edmonds, by "protect[ing] plaintiffs from defendants who are unable to pay judgments entered against them." 443 U.S. at 275 n. 2, 99 S.Ct. at 2764 n. 2 (Blackmun, J., dissenting). The purpose of modified joint liability, of course, is to remove that protection. Consequently, since both policies cannot be simultaneously accommodated, a choice between the policies must be made.
 
 
 132
 To date, under general maritime, the policy of the Supreme Court has been clear--ensure that injured plaintiffs are made whole, even at the expense of overburdening defendants. See Edmonds, 443 U.S. at 271-72 n. 30, 99 S.Ct. at 2762 n. 30 ("[T]he general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury.... Contribution remedies the unjust enrichment of the concurrent tortfeasor, and while it may sometimes limit the ultimate loss of the tortfeasor chosen by the plaintiff, it does not justify allocating more of the loss to the innocent employee, who was not unjustly enriched."). Because the Supreme Court has never questioned the wisdom of the traditional rule of joint and several liability, nor retreated from the policy behind the rule, the choice of the courts of appeals has also been clear: They have refused to limit a contributorily negligent seaman's recovery of damages under general maritime law to an amount less than an amount which will make the seaman whole--that is, the total amount of the judgment minus only that amount which represents the seaman's contributory negligence. See, e.g., Self v. Great Lakes Dredge & Dock Co., 832 F.2d 1540, 1545-48 (11th Cir.1987) (holding that "the philosophy governing Edmonds is clear: any inequity which results from the implementation of a seaman's damage award should be borne by the tortfeasors rather than the seaman himself," even where the seaman was contributorily negligent); Joia v. Jo-Ja Serv. Corp., 817 F.2d 908, 916-17 (1st Cir.1987) (rejecting proportionate liability under both the Jones Act and general maritime law because of the "inequity" which would result from decreasing a contributorily negligent seaman's damages).
 
 
 133
 It actually comes as no surprise to me that both the Supreme Court and the circuit courts have aligned themselves with a policy of ensuring a seaman's full recovery, regardless of the burden it places upon maritime defendants. That policy coincides with the general policy which has long guided the course of maritime law as it relates to the rights of seamen: "Seamen, of course, are wards of admiralty whose rights federal courts are duty-bound to jealously protect." Bass v. Phoenix Seadrill/78 Ltd., 749 F.2d 1154, 1160-61 (5th Cir.1985); see, e.g., Vaughan v. Atkinson, 369 U.S. 527, 531-33, 82 S.Ct. 997, 999-1001, 8 L.Ed.2d 88 (1962); Garrett v. Moore-McCormack Co., 317 U.S. 239, 244-48, 63 S.Ct. 246, 250-52, 87 L.Ed. 239 (1942). Support for the traditional rule of joint and several liability comes from more, therefore, than just a tort policy of making plaintiffs whole; it comes also from a more general policy under maritime law of favoring and protecting seamen. While the traditional rule is, therefore, fully consonant with general maritime law, the rule of modified joint liability--supported, as it is, by a policy which eschews the protectionism that general maritime law embraces--is in conflict with the maritime law's general philosophy concerning seamen's rights. To choose the rule of modified joint liability over the rule of traditional joint and several liability, therefore, would be to choose to break from that general philosophy. While I do not dispute that this court has the power to so change the course of maritime law, I have to think that such a major change should not be undertaken without any indication that our historical concern for protecting seamen has become obsolete--and I am not alone in my opinion. Recently, the Eleventh Circuit declined the opportunity to make a similar change in the policy of general maritime law with a simple explanation:
 
 
 134
 [T]he general goal of maritime law is to provide quick and full compensation to the injured seaman, while leaving the primary litigation dispute to the question of which joint tortfeasor is liable for what percentage of the damage. Historically maritime law has treated seamen as in need of special protection; until the Supreme Court suggests otherwise, we cannot move away from that special protection to an arguably more "efficient" system in which an injured seaman is viewed as an equal party with equal bargaining power.
 
 
 135
 Self, 832 F.2d at 1548. Judge Garwood's dissent points me to no opinion other than his own which suggests that our policy of protecting seamen has lost its force. Therefore, I decline Judge Garwood's call for this court to modify the general maritime law by replacing traditional joint and several liability, and the policies it reflects, with modified joint liability, and the policies it reflects.
 
 
 136
 Having explained why I cannot agree to modify the Jones Act and will not agree to modify general maritime law as Judge Garwood's dissent suggests, I make one final point. As Judge Garwood concedes, none of the parties ever advanced the theory of modified joint liability Judge Garwood's dissent proposes. We have a general rule in this circuit against addressing arguments that have not been raised either to us or to the district court.[4] Part of the justification for that rule is that, to borrow from Justice Blackmun, "the adversary process functions most effectively when we rely on the initiative of lawyers, rather than the activism of judges," to raise and address issues. New Jersey v. T.L.O., 468 U.S. 1214, 1216, 104 S.Ct. 3583, 3585, 82 L.Ed.2d 881 (1984) (dissenting from order directing reargument). Were I not otherwise convinced that we should not adopt modified joint liability at this time, therefore, I would still refrain from joining Judge Garwood's entreaty. I could not sanction the adoption of an admittedly novel and assuredly complex theory which dramatically changes existing law when that theory has bypassed the adversary process altogether. Which means, as far as I am concerned, that this panel's debate over Judge Garwood's theory--a debate which first surfaced eight months after the case had been orally argued and which has occupied the members of this panel for six more months thereafter--has been purely an academic exercise. In a non-maritime case, such an unnecessary delay in resolving the parties' dispute would be regrettable; in this maritime personal injury case, where a seaman is still waiting, seven years after his injury, for the compensation to which he is entitled, it is unacceptable. By saying this, I do not mean to impugn the motives of any member of this panel. Indeed, only judges with the best of motives would have expended the time and effort represented by the various opinions in this case. But what we have been engaged in here has greatly disserved the interests of the litigants in this case, and that is a result even the highest motives cannot justify.
 
 
 
 [1]
 The limitations period applicable to Jones Act claims is three years. 45 U.S.C. Sec. 56 (Federal Employers' Liability Act limitations period applicable to Jones Act); Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 228 (5th Cir.1984). No set limitations period governs maritime claims. Instead, the doctrine of laches is applied with a presumption that the claim is barred if filed past the Jones Act limitations period. Albertson, 749 F.2d at 233; Watz v. Zapata Off-Shore Co., 431 F.2d 100, 111 (5th Cir.1970)
 
 
 [2]
 Before trial, the parties stipulated both to Simeon's seaman status and that his lost past ($126,403.50) and future ($43,500) wages totaled $169,903.50. The parties also stipulated that Smith's insurer had paid, at date of trial, (1) $73,416 of this sum (leaving a balance of $96,487.50, consisting of $52,978 past and $43,500 future wages); (2) all of Simeon's medical expenses (cure) incurred to date of trial ($51,457.47); and (3) $12,880 in maintenance. Therefore, the only damages as to which findings were sought at trial were for (1) Simeon's past and future pain, suffering, loss of enjoyment of life, disablement, and disfigurement; (2) his future medical expenses; and (3) Mrs. Simeon's claim for loss of consortium
 
 
 [3]
 Although there was not complete diversity between the parties, it is settled that an unseaworthiness claim when combined with a Jones Act claim is likewise triable to the jury even in the absence of diversity. Cruz v. Hendy International Co., 638 F.2d 719, 723 (5th Cir.1981); Smith v. Atlas Off-Shore Boat Service, Inc., 653 F.2d 1057, 1064 (5th Cir.1981). In his complaint, Simeon requested "trial by jury of all matters cognizable before a jury."
 
 
 [4]
 Smith was covered by a $500,000 liability insurance policy issued by Midland Insurance Company. Midland had already paid Simeon, on behalf of Smith, $137,753.47 in lost wages, maintenance, and medical expenses (cure). This left $362,246.53 in unpaid coverage. As to Smith's liability, the district court ordered Smith and Midland liable in solido for the amount of remaining coverage and then held Smith separately liable for the $146,116.22 remainder of the total $508,362.75 award against it
 The district court also gave Smith judgment over against Lumar for thirty-two percent of the referenced $137,753.47 pretrial payments made on behalf of Smith to Simeon; no party makes any complaint of this on appeal.
 
 
 [5]
 Shortly before trial, Lumar's insurer, Glacier General Insurance Company, was ordered liquidated by a Montana state court. Thus, Lumar apparently has no insurance coverage for its liability
 
 
 [6]
 The district court made a slight miscalculation. Thirty-two percent of $576,489.50 is $184,476, not $184,576 as the district court stated. We will treat the judgment as being for $184,476
 
 
 [7]
 It is useful to examine verdicts rendered in other cases involving similar injuries. See Zeno, 803 F.2d at 181-82; Caldarera, 705 F.2d at 785. But see Allen v. Seacoast Products, Inc., 623 F.2d 355, 364 (5th Cir.1980) (citing Fifth Circuit precedent for proposition that comparison of verdicts in other cases is not a satisfactory manner for determining excessiveness in particular case); see generally Wakefield v. United States, 765 F.2d 55, 59 (5th Cir.1985) (collecting conflicting cases and concluding that "[c]ommon sense dictates ... that reference to other awards is more or less useful"). Following is a sampling of the cases we examined involving somewhat comparable injuries:
 a. Noel v. Geosource, Inc., 585 F.Supp. 487 (E.D.La.1984) (damages fixed by court). Injury: foot crushed when trapped between dock and moored barge; severe fractures, complications from burn fragmentation, traumatic arthritis. Award: $130,000 for past and future pain and suffering, mental suffering, and physical disability.
 b. Fisher v. Danos, 595 F.Supp. 461 (E.D.La.1984) (damages fixed by court), aff'd by unpublished opinion, 774 F.2d 1158 (5th Cir.1985). Injury: passenger in skiff suffered open fracture of right leg between knee and ankle, fracture of left leg and hip, fracture of collarbone; portion of left femur was removed to equal height of legs. Award: $200,000 for general damages including pain and suffering.
 c. Musial v. A & A Boats, Inc., 696 F.2d 1149 (5th Cir.1983) (damages fixed by court). Injury: oil platform cook suffered crushed heel necessitating fourteen operations culminating in the amputation of his leg. Award: $460,616.33 in total, presumably including some amount for pain and suffering.
 d. Harper v. Zapata Off-Shore Co., 563 F.Supp. 576 (E.D.La.1983) (damages fixed by jury), rev'd, 741 F.2d 87 (5th Cir.1984). Injury: seaman suffered severe back injury requiring two laminectomy operations. Award: $1,000,000 compensatory damages, which included about $485,000 for pain and suffering. See 741 F.2d at 93. On appeal, we remitted this amount by $200,000. Id.
 e. Robert v. Conti Carriers & Terminals, Inc., 692 F.2d 22 (5th Cir.1982) (damages fixed by jury). Injury: while loosening shore line, deckhand suffered partially disabling injuries to hands necessitating twenty-three days' hospitalization and six operations. Award: about $115,000 in pain and suffering.
 f. James v. River Parishes Co., 686 F.2d 1129 (5th Cir.1982) (damages fixed by court). Injury: deckhand suffered painful initial injuries in vessel collision and required physical therapy ("including painful nerve root conduction studies," id. at 1133), surgery, and had to wear a leg and foot brace for remainder of his life. Award: $200,000 for pain and suffering.
 g. Shows v. Jamison Bedding, Inc., 671 F.2d 927 (5th Cir.1982) (damages fixed by jury). Injury: auto accident victim suffered broken arm, fractured and dislocated wrist, broken rib, concussion, deep scalp wound, required bone graft, permanently disabled, would suffer pain. Award: $600,000, about $500,000 of which was for pain and suffering.
 h. Brown v. Penrod Drilling Co., 534 F.Supp. 696 (W.D.La.1982) (damages fixed by court). Injury: seaman struck by joint of casing suffered facial hemorrhages, two skull fractures, shoulder separation, paralysis on left side of face, loss of hearing in one ear; hospitalized sixteen days, four surgeries required. Award: $75,000 pain and suffering.
 
 
 [8]
 The entire testimony on this point is as follows:
 "Q. Doctor, if you were to have to perform additional surgery to fuse that ankle for Mr. Simeon, what, approximately, would that cost in surgical fees and hospitalization?
 "A. Probably the fees will be around 1500, the surgeon's fees with assistance and he will have to stay in the hospital about two weeks.
 "Q. What are hospitals costing nowadays, for that kind of operation?
 "A. You probably will have to count about $400.00 a day, meaning plastic, plus surgical fees, plus anesthesia fees, et cetera. You are talking about probably $10,000.00. Again, probably, that's just off the top of my head. I am not expert on that. I don't know, the cost of hospitals continues to rise, so I don't know."
 The physician also testified that he had previously advised Simeon to return for a follow-up visit at a time after trial. Simeon testified that his doctor had instructed him to return for office visits once every two months. The frequency of Simeon's visits had declined markedly since his injury, and there was no evidence of the cost of these visits.
 
 
 [9]
 Liability in collision cases arises from a finding of fault. See, e.g., The Atlas, 93 U.S. at 310, 23 L.Ed. at 865; The Washington, 76 U.S. at 514, 19 L.Ed. at 788; The Alabama, 92 U.S. at 695, 23 L.Ed. at 763
 
 
 [10]
 Though many early admiralty cases involve cargo and vessel damages arising from collisions, see cases described in text, or injuries to seamen arising from vessel unseaworthiness, see generally Dixon v. United States, 219 F.2d 10, 12-16 (2d Cir.1955) (per Harlan, J.) (discussing historical evolution of unseaworthiness recovery), as early as 1882 the Supreme Court had recognized a maritime tort for personal injury unrelated to collision or unseaworthiness. Leathers v. Blessing, 105 U.S. 626, 26 L.Ed. 1192 (1882) (business visitor on vessel recovers for personal injury caused by negligently stowed cotton bale). In modern times, the general maritime claim for negligence is ubiquitous
 
 
 [11]
 In holding the defendants in this case severally and not jointly liable, the district court relied on Leger v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir.1979), and Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154 (5th Cir.1985). Neither of those maritime cases purports to eliminate the well established maritime rule of joint liability. Leger stands for the proposition that when a named defendant concurrent tort-feasor settles, the nonsettling concurrent tort-feasor found liable at trial is not responsible for any sum representing the settling tort-feasor's share of blame (but is also not entitled to a credit representing amounts paid by the settling defendant in excess of that defendant's share of fault). In Bass, a joint tort-feasor defendant settled prior to trial for $50,000 less than it would have had to pay after trial based on its percentage share of liability. Judgment against the remaining joint tort-feasors was for only their respective shares of liability, and not for any amount representing the settling tort-feasor's percentage share of liability. Id. at 1157. The question of joint liability was not raised in Bass, but the case is consistent with Leger. The rule of Leger and Bass is not really an exception to joint liability because the liability share of the settling defendant tort-feasor has been actually paid and discharged prior to trial; the court simply does not concern itself with the amount of the payment, but only with the discharge of the liability share. When plaintiff settles with a defendant, he risks getting less than he would at trial--the remaining defendants should not have to cover that risk. Similarly, the remaining defendants should not benefit from plaintiff's risktaking if plaintiff gets more in settlement than he would have at trial from the settling defendant. The Leger/Bass rule (the appropriateness of which we do not question) does not apply in this case because no tort-feasor settled
 
 
 [12]
 Otherwise stated, Simeon (if he accepts our remittiturs) has a total judgment of $635,838.75 (ninety percent of $706,487.50, his total damages against Smith as remitted) for all of which Smith is liable to Simeon, but for only $500,838.75 (ninety percent of $556,487.50, Simeon's total damages against Lumar as remitted) of which is Lumar liable to Simeon
 The amounts stated in the text (and in the foregoing sentence) do not include prejudgment interest. As explained in part VII, infra: Simeon is not entitled to recover prejudgment interest from Smith, but is entitled to recover from Lumar appropriate prejudgment interest on so much of the $500,838.75 for which Lumar is jointly and severally liable as represents damages accrued pretrial, and Lumar is not entitled to contribution from Smith in respect to such prejudgment interest.
 Otherwise, contribution between Lumar and Smith is based on their respective percentages of negligence (thirty-two percent for Lumar; fifty-eight percent for Smith) applied to the damages for which they are jointly and severally liable. Hence, with respect to the said principal amounts for which Simeon will have judgment (assuming acceptance of our remittiturs), Lumar will be entitled to contribution from Smith for any portion thereof Lumar hereafter pays Simeon in excess of $178,076 ($178,076 is 32/90ths of $500,838.75, the amount for which Lumar and Smith are jointly and severally liable); and Smith will be entitled to contribution from Lumar for any portion thereof Smith hereafter pays Simeon in excess of $457,762.75 (this $457,762.75 consists of the $135,000 for which Smith is solely liable, plus $322,762.75 which represents 58/90ths of the $500,838.75 for which Smith and Lumar are jointly and severally liable).
 We disregard the pretrial payments made to Simeon by Smith (see notes 2 & 4, supra ) because they are not in issue on this appeal. Neither Lumar nor Smith questions the contribution award in favor of Smith and against Lumar for thirty-two percent of these payments (see note 4, supra ); nor has any party questioned the fact that for purposes of calculating and applying the credit due for these pretrial payments (which include $52,978 of the $126,403.50 wages lost by Simeon after the accident and prior to trial) no account was taken of Simeon's ten percent negligence. We accordingly affirm these rulings of the district court, and its contribution judgment for Smith against Lumar, respecting the pretrial payments.
 
 
 [13]
 Mrs. Simeon launches this argument because she cannot recover loss of consortium damages against Smith (her husband's Jones Act employer) under either the Jones Act or the general maritime law on the basis of Smith's negligence. Beltia v. Sidney Torres Marine Transport, Inc., 701 F.2d 491, 492-93 (5th Cir.1983); Cruz v. Hendy International Co., 638 F.2d 719, 723 (5th Cir.1981) (citing Fifth Circuit precedent). However, she can recover those damages from Smith on the basis of unseaworthiness under general maritime law. See American Export Lines, Inc. v. Alvez, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980). Mrs. Simeon would rather be able to collect her damages from Smith, which is insured and apparently solvent, than from Lumar, which is not insured and allegedly of questionable solvency
 Mrs. Simeon also claims that she should be entitled to recover from Smith under the general maritime law for its negligence, although she recognizes that her claim is contrary to controlling precedent in this Circuit. Based on Beltia and Cruz, we reject her claim for such negligence-based recovery, either under general maritime law or the Jones Act, from her husband's Jones Act employer.
 
 
 [14]
 That Mrs. Simeon is properly chargeable with her husband's negligence is not questioned by her and is in accord with the weight of authority. See, e.g., W. Prosser & P. Keeton, Prosser & Keeton on The Law of Torts Sec. 125 at 937 (1984) ("[T]he courts generally have considered that the recovery of the spouse ... will be defeated or diminished by defenses which would bar or diminish that of the injured spouse.... Thus contributory negligence ... on the part of the injured person has been held to defeat recovery, or, in comparative negligence states, to reduce it." (Footnotes omitted.)); F. Harper, F. James, O. Gray, 3 The Law of Torts Sec. 8.9 at 555 n. 17 (2d ed. 1986) ("[W]here the doctrine of comparative negligence obtains, most courts have similarly reduced the award for loss of consortium by the percentage of negligence attributed to the physically injured spouse."); A.L.I., Restatement (Second) of Torts Sec. 494 & comment c; Annot., Negligence of Spouse or Child as Barring or Reducing Recovery for Loss of Consortium by Other Spouse or Parent, 25 A.L.R. 4th at 118 (1983); Choctaw, Inc. v. Wichner, 521 So.2d 878 (Miss.1988). To say that the loss of consortium action by the spouse not physically injured is independent is not the same as saying that it is not derivative of the injured spouse's right of action. See Whittlesey v. Miller, 572 S.W.2d 665, 667 (Tex.1978)
 
 
 [15]
 This traditional view is not accepted by all jurisdictions. Some courts have permitted contribution in favor of a "concurrent" tort-feasor even where the tort-feasor from whom contribution is sought could not have been directly liable to plaintiff. F. Harper, F. James, O. Gray, supra, Sec. 10.2 at 47-50; see also Annot., Modern Status of Effect of State Workmen's Compensation Act on Right of Third-Person Tortfeasor to Contribution or Indemnity from Employer of Injured or Killed Workman, 100 A.L.R.3d 350 (1980) (collecting workers' compensation cases permitting and denying contribution); Annot., Right of Tortfeasor to Contribution from Joint Tortfeasor Who is Spouse or Otherwise in Close Familial Relationship to Injured Party, 25 A.L.R. 4th 1120 (1983) (collecting family immunity cases permitting and denying contribution)
 
 
 [16]
 Particularly in view of the substantial delay in filing suit, and the fact that the case was not tried for more than a year thereafter, the district court on remand should also consider the date or dates from which prejudgment interest should commence to accrue on the various items of damages which had been incurred and accrued by the time of trial. It seems plain that some of these items were not accrued or incurred until a substantial time after the injury (for example only, some of the unpaid pretrial wages)
 
 
 [17]
 On remand, the district court shall fix the time and manner within and by which Simeon may accept the remittiturs we have ordered; on failure to so accept them, a new trial shall be ordered
 
 
 [1]
 It is recognized that neither Smith nor Lumar has advanced the theory urged in this opinion. Yet I believe that the question--which is purely one of law and is plain on the face of the record--is properly before the panel. Simeon, by cross-appeal (clearly motivated by fears of Lumar's insolvency), challenges the district court's limitation of his recovery against Smith to fifty-eight percent of his total damages. We properly find this limitation is in error and we must accordingly tell the district court what the appropriate percentage is. Surely we will not tell the district court to apply what we believe to be a legally erroneous percentage. Similarly with respect to the loss of consortium claim, Lumar appeals, contending that assessing it ninety percent of the damages was error, in light of the negligence percentages found. If we conclude that Lumar is correct--that, as it claims, ninety percent is too much--then it makes little sense to affirm simply because Lumar has sought too great a reduction--to thirty-two percent rather than to 32/42nds
 
 
 [2]
 I do not address the appropriateness of such a comparison where its purpose is to determine whether, under a modified comparative fault regime, the plaintiff's contributory negligence is sufficiently great to bar all recovery, or all recovery from a particular one of several defendants. See, e.g., Mountain Mobile Mix, Inc. v. Gifford, 660 P.2d 883, 886-87 (Col.1983) (reviewing authorities on this point)
 
 
 [3]
 B's sole liability for five percent ($5,000) of A's total damages is arrived at by subtracting C's seventy-five percent ($75,000) maximum exposure percentage from A's eighty percent ($80,000) maximum recovery percentage. Similarly, C's sole liability for thirty percent ($30,000) of A's total damages is calculated by subtracting B's fifty percent ($50,000) maximum exposure percentage from A's eighty percent ($80,000) maximum overall recovery percentage. The forty-five percent ($45,000) of A's total damages for which B and C are jointly and severally liable is calculated by subtracting the sum of B's five percent ($5,000) sole liability and C's thirty percent ($30,000) sole liability--which aggregate thirty-five percent ($35,000)--from A's eighty percent ($80,000) maximum overall recovery (eighty minus thirty-five equals forty-five)
 
 
 [4]
 B's entitlement to contribution from C for payments by B in excess of twenty percent ($20,000) of A's total damages corresponds to B's percentage (twenty percent) of the combined fault of A, B, and C. Similarly, C's entitlement to contribution from B for payments by C in excess of sixty percent ($60,000) of A's total damages corresponds to C's percentage (sixty percent) of the combined fault of A, B, and C. This is no different than contribution under conventional joint liability
 
 
 [5]
 The (A), (B), and (C) amounts are calculated as follows:
 (A) The $26,187.65, for which Lumar is solely responsible, constitutes the difference between (i) the $500,838.75, which represents the ninety percent maximum that Simeon is entitled to recover from all sources out of the $556,487.50 total damages common to both the Smith and Lumar claims, and (ii) the $474,651.10, representing the maximum portion (58/68ths) of that $556,487.50 for which Smith could be responsible to Simeon ($500,838.75 minus $474,651.10 equals $26,187.65).
 (B) The $204,789.49, for which Smith is solely responsible, is calculated in three steps. First, with respect to the $150,000 total Simeon damages which are entirely inapplicable to the claim against Lumar, Smith (and Smith alone) is responsible to Simeon for $127,941.18, which is 58/68ths thereof. Second, the amount of $76,848.31 is calculated with reference to the $556,487.50 total damages common to the Smith and Lumar claims; Simeon is entitled to recover ninety percent of this $566,487.50, or $500,838.75, from all sources, and up to $423,990.44 thereof (32/42nds) from Lumar. The $76,848.31 represents the difference between the $423,990.44 (the maximum recoverable from Lumar) and the $500,838.75 (the maximum recoverable from all sources respecting the $556,487.50). Third, the $127,941.18 (step one) and the $76,848.31 (step two) are added together to give the total of $204,789.49 awarded against Smith alone.
 (C) As to Lumar, this $397,802.79 for which it has joint liability with Smith, represents the difference between Lumar's maximum potential liability to Simeon of $423,990.44 (32/42nds of the total $556,487.50 Simeon damages in the Lumar claim) and the $26,187.65 ((A) above) for which Lumar alone is liable. As to Smith, this $397,802.79 for which it has joint liability with Lumar, represents the difference between Smith's maximum potential liability to Simeon of $602,592.28 (58/68ths of the $706,487.50 total Simeon damages in the Smith claim) and the $204,789.49 ((B) above) for which Smith alone is liable.
 
 
 [6]
 The same point can be made if the illustration is changed so that, for example, C's conduct contributing to the accident is his admitted failure to see the clearly visible cars driven by A and B; the evidence is conflicting as to whether C's failure in this respect stems from his negligent inattention or, as he claims, from his then suffering a sudden, momentary and unforeseeable fainting spell. A finding that C was negligently inattentive does not change the relationship between the negligence of A and B or imply any enhancement of A's damages
 
 
 [7]
 Moreover, if C is found at fault, A has an additional source for potential recovery
 
 
 [8]
 Pure several fault is also unjust in this scenario. If B can take any advantage of C's being at fault, it should only be as against C (by contribution), not as against A (by lowering B's exposure to A), for the addition of C's fault does not change the ratio of fault between A and B, and B's fault remains a cause of all A's damages whether or not C also is guilty of causative fault
 
 
 [9]
 In Drake, the court indicated that a different result (where the third-party settlement payment would reduce the plaintiff's recovery by the proportion which the third party's fault bore to the total fault of the plaintiff, the defendant, and the third party, rather than on a dollar-for-dollar basis) might be reached if the defendant had impleaded the third party (in which event, the extent of the third party's negligence would presumably be relevant). Id., 765 F.2d at 1068. However, in Self v. Great Lakes Dredge & Dock Co., 832 F.2d 1540, 1544-48 (11th Cir.1987), the Eleventh Circuit applied the Drake approach (dollar-for-dollar credit of the third-party settlement payment), even though the third party was before the court on the defendant's cross-action and its percentage of fault was ascertained. Self regarded this holding as mandated by Edmonds, though it recognized it to be contrary to our holding in Leger v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir.1979), and in post-Edmonds cases where we followed Leger. See Self, 832 F.2d at 1548 & n. 6. We have indeed followed Leger (settlement reduces recovery by proportion of settling party fault) in post-Edmonds cases, both maritime, e.g., Martin v. Walk, Haydel & Associates, Inc., 742 F.2d 246, 249 (5th Cir.1984); Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154, 1157, 1159 (5th Cir.1985); see also In re Incident Aboard D/B Ocean King, 813 F.2d 679, 689 (5th Cir.1987), and otherwise, e.g., Diggs v. Hood, 772 F.2d 190, 196 (5th Cir.1985) (relying on Leger ). On the other hand, in our recent decision in Hernandez v. M/V Rajaan, 841 F.2d 582, 591 (5th Cir.1988), we applied Self at the behest of the defendant, who successfully sought a dollar-for-dollar credit for the settlement amounts paid the plaintiff by the third-party defendants, even though there was apparently no finding of the percentage of fault attributable to the third-party defendants
 It is not necessary for this dissent to take a position as to whether the Leger rule or the Self rule represents binding precedent or is preferable. All of these cases concern the special problems attendant on how to credit the settlement of one of several tort-feasors. That is not involved here.
 Under the Leger approach, if plaintiff A settles before trial with concurrent tort-feasor C, and at trial A is found to have $150,000 total damages and to be one-third negligent, while C and defendant B are also found to each be one-third negligent, then B is held liable to A for $50,000, as the settlement, whatever its amount, is treated as discharging one-third of A's total damages. In that context, modified joint liability has no role to play. It is appropriate to regard A's settlement with C (regardless of its amount) as encompassing both the sole liability which C would otherwise have had for $25,000 and C's half of the joint liability (with B) for $50,000. A and C have voluntarily agreed on this when either could have insisted on trial, and so there is no reason either should be able to question it (A to seek more on account of C's fault, C to seek contribution); B may not justly complain that C paid the wrong amount, for it was C, not B, that did the paying, and B is treated no worse than if there had been no settlement.
 Under the Self approach, it is presumably not proper to find whether or not the settling party is negligent, or, if so, what its percentage of negligence is. This suggests that the relevant comparison at trial is between the negligence of the plaintiff and the nonsettling defendant only. That was apparently the case in Hernandez, 841 F.2d at 591, and is fully consistent with modified joint liability. In Self, the plaintiff was not negligent, so modified joint liability simply could not come into play.
 None of these cases, however, in any way addresses the concept of modified joint liability.
 
 
 [10]
 As the Edmonds footnote subsequently points out, this assumes that the injury in question is not divisible. Edmonds, 99 S.Ct. at 2756 n. 8. I make the same assumption throughout this dissent
 
 
 [11]
 Under modified joint liability, the Edmonds shipowner would have been liable for two-thirds (20/30ths), rather than ninety percent, of the injured plaintiff longshoreman's total damages, as there the negligence percentages were: twenty percent, shipowner; ten percent, plaintiff; seventy percent, stevedore
 
 
 [12]
 In Webster, the Court stated: "We do not stop to inquire whether all or any of them [prior Supreme Court decisions cited by appellant] can be differentiated from the case now under consideration, since in none of them was the point here at issue suggested or decided. The most that can be said is that the point was in the cases if any one had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Id., 45 S.Ct. at 149
 
 
 [1]
 "The plaintiff's contributory negligence" means, as it is used throughout this opinion, the percentage that plaintiff's fault is of the total fault of all parties including himself. Judge Garwood does not dispute that under either traditional joint and several liability or the modified system he proposes, the cap on a plaintiff's recovery is measured by the total amount of the judgment the plaintiff obtains minus that amount which represents the plaintiff's contributory negligence. Nor does Judge Garwood dispute that if all the defendants are solvent, the plaintiff should be permitted to recover damages equal to that amount
 
 
 [2]
 Algebraically, in a case involving two defendants, this can be expressed as follows:
 Variables: x= percentage by which plaintiff was contributorily negligent;
 
 
 y1
 = percentage by which defendant one was negligent;
 
 
 y2
 = percentage by which defendant two was negligent
 Assumptions: (1) x + y1 + y2 = 100%
 (2) the amount of plaintiff's damages as found in the cause of action against y1 is the same as the amount found in the cause of action against y 2
 Percentage of total judgment that plaintiff can recover from either defendant under traditional joint and several liability:
 
 
 [100]
 - x
 Percentage of total judgment that plaintiff can recover from defendants under modified joint and several liability:
 
 
 [3]
 Judge Garwood discusses separately each of these same passages to explain why, in his view, they do not conflict with the modification he proposes. Judge Garwood's basic reason is that in explaining how joint liability is imposed, the Supreme Court never explicitly said whose negligence a plaintiff's negligence is to be compared with. To the extent that Judge Garwood is arguing that the Supreme Court was not discussing traditional joint and several liability in these passages, I find the argument both surprising and unconvincing. It is beyond dispute that traditional joint and several liability compares the plaintiff's negligence with all defendants' negligence when determining the total damages each defendant is jointly responsible for--that is, in fact, Judge Garwood's problem with the system of liability as it presently exists. It is beyond dispute that comparing the plaintiff's negligence to that of all defendants is the rule of common law, and that the Supreme Court was repeating the common law rule in Edmonds. It is beyond dispute that as Edmonds reached the Supreme Court, Edmonds' negligence had been compared to that of both, not each, of the defendants, and that liability had been divided accordingly. And finally, I think, it is beyond dispute that the Supreme Court approved that particular comparison in Edmonds. If the Supreme Court did not explicitly say that the proper comparison of a plaintiff's negligence is with all of the defendants' negligence, it is probably because it saw no need to, since no court had ever suggested--much less used--any other method of comparison
 I am similarly unconvinced by Judge Garwood's additional attempts to bring the language of Edmonds into conformity with his proposal to modify the traditional rule of joint and several liability.
 
 
 [4]
 Judge Garwood takes the position that the question is properly before the panel simply because we have found, upon Simeon's urging, that the district court erroneously entered judgment severally against the defendants. Because the new theory Judge Garwood has suggested would affect the way judgment is entered on remand, Judge Garwood argues, we must decide now whether to accept or reject the theory. If Judge Garwood is right on this point, I do not see how he can admit that modified joint liability is inconsistent with the results of some already decided cases--including Edmonds--but conclude that because neither this circuit nor the Supreme Court has expressly rejected the theory, we should treat it as unconsidered by those courts. This inconsistency in reasoning aside, however, I cannot agree with Judge Garwood's apparent assertion that any issue which could affect the judgment a district court is to enter on remand is ripe for review, regardless of whether it was ever mentioned by the parties